1821.

Fanning
v.
Dunham.

## Fanning *against* Dunham.

Where *D.* lent *F.* his promissory notes, and received the notes of *F.* for the same amount, in exchange, and also a *commission of two and an half per cent.*, which exceeded the legal interest for the time the notes had to run, the transaction was held to be usurious, and the notes and other securities given by *F.* void.

If the lender of money, on an usurious contract, seeks to enforce his securities in this Court, and the borrower sets up the *usury* as a defence, and proves it, the securities will be declared void, and ordered to be delivered up and cancelled. But where the lender has proceeded at law, and recovered a judgment, on a bond and warrant of attorney, or is proceeding to foreclose a mortgage, by virtue of a power of sale, under the statute, without the aid of this Court; and the borrower files his bill for relief against the judgment or other legal securities, on the ground of usury, he must, before he can be entitled to relief, pay or offer to pay the principal and interest lawfully due; and that, whether the usury be established by proof, or admitted by the defendant's answer.

*Dec.* 1, 1820,
and
*Feb.* 10, 1821.

THE bill, filed *August* 2, 1813, stated, that on the 26th of *October*, 1811, the plaintiff and defendant, who had dealings together in the exchange of promissory notes, &c. entered into a written agreement, which recited that the defendant had advanced to the plaintiff, at sundry times, his promissory notes in exchange, amounting to 188,464 dollars and 88 cents, and for which the defendant was entitled to a commission of *two and an half per cent.*; and a further advance of 20,000 dollars, in exchange of notes, was agreed upon, in four notes, payable in 2, 3, 4, and 5 months, with the privilege of one renewal; and also, the further advance of 25,000 dollars, in the notes of the defendant, payable at 6, 7, 8, and 9 months, with notes of the plaintiff in exchange, subject to a commission of two and an half per cent., as well as the said renewals; and thereupon, the plaintiff, in consideration of the above advantages, assigned to the defendant

all his right to the ship *Bordeaux* and cargo, the ship *Tea Plant* and cargo, and the schooner *Brothers* and her cargo, which three vessels were then on foreign voyages, and it was agreed that the plaintiff's interest in the said vessels and cargoes should be sold by the defendant at auction, on their arrival; and if the commissions of two and an half per cent. on the said sums, should be equal in amount to the several sums above stated, then no other charge, more than the defendant's interest at seven per cent., and all necessary charges, as auction duty, storage, &c. should be made to the defendant; but if the goods did not amount to that sum, or not arriving, then the plaintiff guaranteed to the defendant his full commissions on any deficiency that should so occur; and the defendant was to have full power to take possession of the interest of the plaintiff on the arrival of the vessels, and to dispose of the same or hold it, at his discretion, accounting to the plaintiff for the surplus, first deducting his own demand, due by that or any former agreement.

That in the spring and summer of 1812, the plaintiff, finding it necessary to raise money, applied to the defendant, who, from time to time, advanced the plaintiff his notes, in exchange for the plaintiff's notes, and his endorsements on the plaintiff's notes, amounting to 103,678 dollars and 16 cents. And it was agreed between them, that the plaintiff should pay to the defendant a commission of two and an half per cent. on the amount of all such notes and endorsements; viz. the plaintiff was to put into the hands of the defendant, (an auctioneer,) goods to be sold at auction by the defendant, and out of the proceeds he was to retain the commission of two and an half per cent. on the amount of all such notes and endorsements by him advanced, over and above the usual commissions, expenses, and charges, upon such sales made at auction, if such proceeds on sales should be sufficient for the purpose; and if not, the balance or deficiency should be made up and paid by the plaintiff to the

defendant. That as a condition of this last agreement, the plaintiff, upon receiving the notes and endorsements of the defendant, always gave his own notes to the defendant, in exchange for the amount of his notes and endorsements, payable respectively, in each instance, one day before the day on which the notes of the defendant, or the notes of the plaintiff, endorsed by him, were payable.

That on the 9th of *March*, 1812, to secure to the defendant payment of his notes and endorsements and his commission thereon, the plaintiff assigned to him one hundred shares in the *West Chester Manufacturing Society ;* and on the 27th of *April*, 1812, for the same purpose, the plaintiff gave to the defendant a bond conditioned to pay 100,000 dollars, with a warrant of attorney to confess judgment thereon ; but no judgment was to be entered, until there was a default of the notes or endorsements; and on the 12th of *May*, 1812, the plaintiff, for the same purpose, gave to the defendant another bond conditioned to pay 30,000 dollars, and also, a mortgage by him and his wife, on lands at *New Rochelle* and *Pelham*, in the county of *West Chester*.

That on the 27th of *August*, 1812, the defendant gave to the plaintiff a declaration or deed of trust, reciting that the plaintiff was indebted to him in the sum of 43,818 dollars and 30 cents, in promissory notes therein specified, and for securing the amount of those notes, and such other moneys as the plaintiff owed, or might owe to him by the renewal of the said notes, or otherwise, the defendant held the said bond and mortgage, the one hundred manufacturing shares, the ship called the *Zephyr*, one-third of the ship *Tea Plant*, and the said bond and warrant of attorney; and that when the notes and other moneys were paid the bond and mortgage should be cancelled, and the other property given up or re-assigned to the plaintiff. To this deed was annexed a schedule of the notes. That the last mentioned writing was given in lieu of, or as a substitute for, the agreement of the 26th of *October*, 1811. The bill set forth the exchange of

several notes between the parties, and that the plaintiff gave the defendant a note for 229 dollars and 47 cents, with an endorser, for the commissions, or premium thereon. It then set forth other exchanges of notes, and that the defendant's notes were less than the plaintiff's, by the amount of the commission of two and an half per cent. That other exchanges of notes took place ; and that on the 21st of *August,* 1812, the plaintiff gave to the defendants six promissory notes, with an endorser, amounting to 6,898 dollars and 20 cents, all of which were exclusively given for premiums or commissions on the exchanges of notes, as stated in the bill, that sum being the balance, after crediting the amount of sales of the goods of the plaintiff at auction. That several of the notes mentioned in the schedule, besides one of the *premium* notes for 1,149 dollars and 70 cents, were paid by the plaintiff, when they fell due. The bill charged that the defendant had no other notes or demands against the plaintiff, but such as were specified in the schedule, taking out such as were before specified as paid ; and that all the notes remaining unpaid were *usurious* and *void in law ;* and that the bond and warrant of attorney, the bond and mortgage, the assignments of ships and shares held as security for the payment of those notes, were also void in law. That on the 18th of *December,* 1813, before any of the notes became due and remained unpaid, the defendant fraudulently entered up a judgment on the said bond and warrant of attorney, in the Supreme Court, and issued an execution thereon to the sheriff of the city of *New York,* with a direction thereon endorsed, to levy 37,505 dollars of debt, and the costs. That in *January* term, 1813, of the Supreme Court, the plaintiff applied to that Court, who ordered the execution to be set aside, and awarded a feigned issue between the parties, to try whether the bond and warrant of attorney, and the notes for which they were given as collateral security, were not founded on usurious contracts or considera-

tions. That the plaintiff caused the feigned issue to be made up, and gave notice of the trial thereof at the *Kings Circuit,* in *June,* 1813, but the trial was put off by the defendant. That the defendant, in *February,* 1813, fraudulently advertised the mortgaged premises for sale at auction, by virtue of the power contained in the mortgage. That he also advertised and sold at auction, one third of the ship *Tea Plant,* so assigned as security, and fraudently and by force dispossessed the plaintiff. The bill prayed for an injunction against the defendant from proceeding at law on the mortgage, or selling under it, and from sending the *Tea Plant* to sea, assigning the notes and other securities, &c. &c., and for general relief.

The feigned issue having been tried, and a verdict found for the plaintiff, he filed a *supplemental* bill, on the 5th of *April,* 1819, stating the substance of the original bill, and that after the feigned issue was made, but before it was tried, this Court, on the 7th of *December,* 1813, ordered the injunction, so far as it prohibited the defendant from selling the mortgaged premises, to be dissolved, unless the plaintiff should, within eight days, bring the money due on the mortgage into Court; and that on the 16th of *December,* 1813, the plaintiff appealed from that order, to the Court for the Correction of Errors; but it was, afterwards, agreed between the parties, that proceedings on the appeal should be suspended until after a decision on the feigned issue. That the feigned issue was settled, under the directions of the Supreme Court, and the pleadings were set forth in the bill, at length. That the feigned issue was tried before Mr. Chief Justice *Thompson,* at the sittings, in *June* 1815, when the jury found all the issues in favour of the plaintiff; and the bill set out the *postea,* at length, by which it appeared that the jury found that the said bond and warrant of attorney were made and executed upon an usurious consideration; that the said bond and warrant were made as

collateral security, for certain promissory notes made by the plaintiff to the defendant, upon usurious considerations, or upon other engagements and transactions between the parties upon usurious considerations, and that the said promissory notes, for which the bond and warrant of attorney were given as collateral security, were respectively made and delivered upon usurious considerations. That to maintain the feigned issue, the plaintiff gave in evidence the bond and warrant of attorney, the judgment entered thereon, the instrument executed by the defendant, *August* 27th, 1812, and the schedule (A.) thereto annexed, the answer of the defendant to the original bill, and the cross examination of the defendant's witnesses. That after the verdict, the defendant made a *case*, on which to move for a new trial of the feigned issue; that a motion for a new trial was accordingly made and argued in *October* term, 1817, and that Court, in *January* term following, unanimously refused to grant a new trial. That before the *case* was settled, an agreement, dated 7th of *May*, 1816, was entered into between the counsel of the parties respectively, that the defendant might have a bill of exceptions prepared and signed and sealed, in the same manner. as if it had been tendered at the trial of the feigned issue, to the end that a writ of error might be brought, if either party thought proper, and that the decision which should be pronounced on such bill of exceptions, should be final and conclusive upon all matters put at issue, by such feigned issue between the parties. That although the Supreme Court decided against the defendant, he never thought proper to take a bill of exceptions under the said agreement, and bring a writ of error; but has expressly declined doing so. That the writing of the 27th of *August*, 1812 and the schedule A. annexed thereto, and the bond and warrant of attorney, are the same as are set forth in the original bill. That according to the agreement of the 7th of *May*, 1816, the verdict and judgment on the feigned issue, as no writ of error has been

1821.

FANNING
v.
DUNHAM.

brought, conclusively establish the fact, that the said promissory notes and other securities, held by the defendant, are usurious and void; notwithstanding which the defendant still holds the notes and securities, and refuses to give them up, but declares his determination to enforce the payment of the moneys for which the notes, &c., were given. That on the 31st of *October*, 1818, the Supreme Court, by an order, rescinded the order for a feigned issue, and all proceedings thereon, and directed all further proceedings on the judgment against the plaintiffs to be stayed, until the further order of the Court. That in *January*, 1819, the Supreme Court allowed the defendant to take out execution on the judgment.

That the appeal from the order to dissolve the injunction had been dismissed for want of prosecution. The supplemental bill prayed a similar injunction to the one originally granted, &c., and for general relief, &c.

The *answer* of the defendant to the original bill admitted, that for several years prior to the 26th *October*, 1811, the plaintiff was a merchant, and owned ships, &c., and had occasion for large sums of money at different times; and that he applied to the defendant, and obtained an exchange of notes, to a large amount, between *January*, 1806, and *September*, 1808. That by an adjustment of accounts, on the 15th *September*, 1808, the advances of the plaintiff in notes exceeded the sales of goods of the plaintiff, the sum of 35,836 dollars and 43 cents; that upon that adjustment, the plaintiff gave to the defendant a note for 881 dollars and 84 cents, payable in nine months; and a memorandum was then made, stating that the note was given for the balance of a commission of two and a half per cent. on 35,836 dollars and 43 cents: and that a commission of two and a half per cent on sales by the defendant of the plaintiff's goods within the nine months, should be credited on that note; but if no sales within that time, the commission ac-

count was to be considered as definitively adjusted. The defendant admitted that the plaintiff agreed to allow him two and a half per cent. commission on the amount of his notes advanced for the plaintiff; and for which he was to sell goods at auction, if furnished by the plaintiff; and he denied that he charged the plaintiff more than one commission of two and a half per cent., whether he sold goods or not, which was for his trouble and risk in advancing notes. The defendant admitted the agreement of the 26th of *October*, 1811; and alleged that the notes therein mentioned were all advanced subsequently to the 15th of *September*, 1808, and a receipt or memorandum was always given, expressing the conditions upon which they were advanced; all which receipts were of the following tenor: "Received, *New-York*, *May* 30, 1809, of *David Dunham*, his note for 1,325 dollars and 72 cents, ninety days, from 29th *May*, for my note, for same amount, subject to the same charges as per settlement of our former account." The defendant admitted that in the spring and summer of 1812, the plaintiff applied to him for large advances in notes, which were made as stated by the plaintiff, but they were all made under the agreement of *October* 26th, 1811. That in 1812, the ships *Bourdeaux* and *Tea Plant* arrived, and the defendant suffered the plaintiff to select, for auction, such parts of the cargoes as he thought proper; and suffered all the silks on board the ships to be sold by the plaintiff at private sale. That some part of the cargo of the *Tea Plant* being under some claim, could not be delivered to the defendant, who thereupon endorsed notes of the plaintiff's for 15,833 dollars and 34 cents, for which *Fanning & Co.* gave endorsed notes, as collateral security, and agreed to allow the defendant two and a half per cent. for commissions. He denied that any commission or premium was charged by him beyond the ordinary sales at auction, though such additional commission of two and a half per cent. on notes advanced, beside the commission of two and a half per cent. on sales at auction, was not illegal. He

admitted that the notes given by the plaintiff were always payable one day sooner than the defendant's notes, but the notes endorsed by the defendant were one day later. That on the 9th of *March*, 1812, the defendant gave the plaintiff two notes for 3000 dollars each, and the plaintiff assigned to him, as collateral security, the one hundred shares in the manufactory at *W.*, and gave his notes for the same amount, subject to a commission of two and a half per cent., and sales, to be effected or commissions collected from his part of the cargo of the *Tea Plant ;* and that if no sales were effected, so as to cover the commissions, the defendant was to be at liberty to sell the manufacturing shares ; and, in all cases, the commission of two and a half per cent. was to be secured. He admitted the bond and warrant of attorney of the 27th of *April*, 1812, the bond of the 12th of *May*, 1812, and the mortgage and the declaration of trust of 27th of *August*, 1812; but denied that the declaration of trust was intended as a substitute for the agreement of 26th of *October*, 1811, or that it cancelled it. He admitted the several notes stated in schedule A., for which a receipt was given; and he stated a renewal of three notes on the 27th of *August*, 1812, for 3050 dollars and 53 cents each; at which time the plaintiff gave the defendant another note, endorsed by *W. C.* or *S. C. & Son*, for 229 dollars and 27 cents, payble at four and a half months, taken as a settlement of commissions of two and a half per cent. on the renewal of the three last mentioned notes being given, five or six days after an adjustment between the parties, and on account of the declaration of trust. He admitted, that the declaration of trust of 27th of *August*, 1812, was intended as a final settlement, except that the plaintiff had a right to discharge the commission or premium notes, by furnishing goods to be sold at auction, and that the defendant was bound to sell free of commissions, until the amount sold equalled the amount of commissions, at two and a half per cent. on the

gross amount advanced by the defendant for the plaintiff. That in *July* or *August*, 1812, the plaintiff being in great want of money, applied to the defendant for his notes, which the defendant gave, as stated in the bill, for which the plaintiff gave his notes for the like amount, payable one day earlier, being nine in number; and that in *August*, 1812, five notes were exchanged. That all these notes were advanced by the defendant upon the customary mercantile usage, and upon the same terms as all the other notes. That on the 27th of *August*, 1812, the adjustment made between the parties was executed, and the defendant received the six notes of the plaintiff, for 1,149 dollars and 70 cents, each, mentioned in schedule A, for commissions claimed by the defendant, according to their several agreements. That the sum at which the last commissions were made up, were exclusive of the property previously sold for the plaintiff, at auction; but if the defendant had sold at auction, the property which the plaintiff sold at private sale, and the property retained by the plaintiff, the auction commissions would have exceeded the amount of the six notes. He admitted that the usual auction commissions would fall short of the commissions charged to the plaintiff, or 6,898 dollars; but that these commissions did not exceed the amount of such sales at auction, after deducting customary commissions, charges, and expenses. He admitted the entering up of the judgment, on the 19th of *December*, 1812, before the notes were due, the execution, &c. the feigned issue, and proceedings under the mortgage, &c. He admitted that he sold one third of the ship *Tea Plant* to *John Graham*, the purchaser at auction, for 6,575 dollars, on his own account, and that he entered forcibly, to give *J. G.* possession. He admitted the proceedings stated in the supplemental bill, relative to the feigned issue in the Supreme Court; but he said the Court denied the motion for a new trial, because they were of opinion that it was not a case in which they ought to have directed an issue; and

1821.

FANNING.
v.
DUNHAM.

for the same reason they discharged the order for an issue, &c.

*December* 1, 1820.—The cause was this day brought to a hearing on the pleadings and proofs.

*Riggs* and *Wells*, for the plaintiff. They contended,

1. That the facts set forth in the answer of the defendant clearly showed that the notes, mentioned in the writing of the 27th of *August*, 1812, were usurious and void.

2. That the collateral securities taken and held by the defendant, were also void.

3. That if there were any doubt as to the usurious character of the transactions between the parties, the verdict of the jury on the feigned issue, directed by the Supreme Court, was conclusive.

4. That the agreement between the parties of the 7th of *May*, 1816, precluded the defendant from drawing in question the fact of usury; especially as the defendant had obtained advantages by that agreement, amounting to a sufficient consideration in equity, to make it binding on him, and to estop him from denying the usury in the notes, and the consequent invalidity of the securities.

5. That when the fact of usury is admitted by the defendant's answer, or is proved against him by the plaintiff, the securities given for such usurious consideration are equally void in this Court as in a Court of law : and the defendant has stated facts in his answer, from which usury results, as a legal consequence.

6. That all, or most of the notes, mentioned in the schedule A, are payable at such times, that the legal interest for that period is less than the two and a half per cent. which is charged on the amount; and that is usury, in itself, and was so decided in this Court, and in the Supreme Court, and Court of Errors, in a similar case. (*Dunham* v. *Dey,*

13 *Johns. Rep.* 40.   Dunham v. *Gould*, 16 *Johns. Rep.* 367.   1821.
*Dey* v. *Dunham*, 2 *Johns. Ch. Rep.* 182. 193.)

FANNING
v.
DUNHAM.

7. That the sale of the plaintiff's interest in the ship *Tea Plant*, pending the proceedings in the Supreme Court, without judicial proceeding, or notice to the plaintiff to redeem, was unlawful; and rendered the defendant accountable for the proceeds, or for the value of the property.

8. That the manufacturing shares having perished in the hands of the defendant, according to his own showing, when held by an illegal title, he ought to account for their value.

*T. A. Emmet*, for the defendant.   He contended, 1. That the commissions taken by the defendant, on the exchange of notes, were not usurious, and that the notes and other securities were legal and valid.

2. That independent of the commissions, the plaintiff was indebted to the defendant.

3. That the agreement of the 7th of *May*, 1816, had no relation to this cause, and nothing done under it could affect the rights of the defendant.

4. That the Supreme Court, having discharged the order for the feigned issue, and vacated all the proceedings under it, it became impossible for the defendant to prosecute the writ of error, as contemplated by the agreement of the 7th of *May*, 1816.

5. That the Supreme Court, having allowed the judgment obtained by the defendant against the plaintiff to stand, and given leave to issue an execution thereon, its validity was *res judicata*, and could not be questioned here.

6. But even if the transaction were usurious, the plaintiff's bill would be bad on demurrer, and cannot, on the hearing, entitle him to relief, unless he offers and consents to pay the principal and interest really and legally due.

*February* 10, 1821.   The cause stood over for consideration, until this day.

1821.

FANNING
v.
DUNHAM.

Where *D.* lent *F.* his promissory notes, and received the notes of *F.* for the same amount, in exchange, and also a commission of 2 and a half per cent. which exceeded the legal interest for the time the notes had to run, the transaction was held to be *usurious*, and the notes void.

THE CHANCELLOR. 1. The first and great point in this case is, whether the charge of a commission of two and a half per cent. uniformly made by the defendant, upon the advance or endorsement of negotiable notes to and for the plaintiff, was usurious.

The defendant was in the habit of loaning his promissory notes to the plaintiff, and of endorsing negotiable notes for the use and benefit of the plaintiff, from the 1st of *September*, 1808, down to the time that the plaintiff stopped payment, and of taking in return the plaintiff's notes for the same sum, payable within a day of the same periods of time. Instead of being a cash advance, it was a loan of his credit to the plaintiff, and attended with the same risk and trouble, as if he had loaned the cash. The notes answered the purpose of cash to the plaintiff, and considering them as cash, the defendant was entitled to ask and receive interest, in the name of commissions, at the rate of two and a half per cent. or at any rate that did not exceed the rate of seven per cent. per annum. But in every case in which a note was for four months, for instance, two and a half per cent. commissions was more than at the rate of seven per cent., and consequently usurious ; and if for five months, for instance, it was less than the legal rate of interest, and consequently lawful. All the notes remaining unpaid which are specified in the schedule A. annexed to the writing of the date of the 27th of *August*, 1812, and in the pleadings set forth, were infected with usury, because the commission of two and a half per cent. allowed upon each of those notes exceeded the rate of lawful interest thereon. One of the three notes of the date of the 20th and 21st of *August*, 1812, and remaining unpaid, was for five months, but those three notes taken together, with the allowance of the commission of two and a half per cent. on the aggregate sum, exceeded the rate of lawful interest ; and they ought to be taken together, as forming one distinct and entire transaction. The

three notes of the date of the 30th of *March*, remaining unpaid were each for five months ; but it appears in proof that they were not given until the 25th of *April*, though antedated, and a commission of two and a half per cent. upon those notes for the period they were to run, computing from the time they were actually given, exceeded also, the rate of lawful interest. And the five notes in that schedule, given for commissions, were given for comissions containing an unlawful excess of interest. The same objection to the legality of the commissions, will apply to many of the previous transactions of a similar nature detailed in the case, and there can be no doubt that continued usurious exactions, under cover of commissions, at the rate of two and a half per cent. were practised by the defendant upon the plaintiff, from the commencement of their dealing in the exchange of notes.

The defendant has set up, and urged, as a justification for the commissions charged, that they were the usual commissions of merchants and auctioneers, upon the sale of goods, and that those notes were loaned or endorsed on account of expected and promised deposits of goods to be made by the plaintiff, and sold on his account by the defendant. The advances and charges were made, as it is alleged, in anticipation of such deposits, and to ensure to the defendant the advantage of that preference. But the whole history of the case, and all the documents in proof, speak a different language. These assumed deposits were a mere pretext and cover for the charge of these unlawful and usurious commissions. I am perfectly satisfied that the exchange of notes was not made, or these commissions charged upon actual deposits of goods for sale, nor upon the credit of goods *bona fide* expected and intended to be deposited. It was a mere exchange of notes for the purpose of raising money by the one party, and for the purpose of exacting a premium of two and a half per cent. for the loan of his paper, by the other. The endorsement of notes, and

1821.

FANNING
v.
DUNHAM.

the renewal of notes, were all for the same object; and the plaintiff was led on, step by step, into a labyrinth from which he could not extricate himself, and all the profits of his *India* trade, and tangible property at home, were drawn within the grasp of these persevering and usurious exactions. The defendant charged two and a half per cent. premium for every responsibility he assumed, in whatever shape it might be; and when we consider that the same charge was upon every renewal of notes, and that no goods, were, in fact, sold by the defendant, and that during the year 1812, the idea of advances on expected deposits and sales grew more and more improbable and visionary, the whole pretence that the commission had a reference to future deposits and auction sales, is destitute of colour or plausibility. It is impossible to mistake the real nature of the transactions; the accumulated pledges of the judgment bond, mortgage, ships, and manufacturing shares, were all taken by the defendant as collateral securities for his paper and his commissions.

2. The next, and the more embarrassing point, is as to the nature and extent of the relief.

If the defendant was endeavouring to enforce any of his securities in this Court, and the present plaintiff had set up and made out the usury, by way of defence, the remedy would have been obvious. The securities would have been declared void, and ordered to be delivered up and cancelled. But the defendant has not resorted to this Court. He has caused a judgment to be entered up at law, upon the warrant of attorney given by the plaintiff; and the Supreme Court have ultimately refused to afford any relief to the plaintiff against that judgment, though that Court awarded a feigned issue, and had the usury in the bond upon which the judgment was entered, established by the verdict of a jury. The defendant has also proceeded to foreclose the mortgage, not by the aid of this Court, but

*If the lender of money on an usurious contract seeks to enforce any of his securities, and the borrower sets up the defence of usury which is proved, the securities will be declared void, and be ordered to be delivered up and cancelled.*

by advertising under a power contained in the mortgage, and it is the present plaintiff who is compelled to come here and ask for relief, which he cannot obtain elsewhere, against the judgment at law and other legal securities infected with usury, by means of the original transactions and responsibilities which they were intended to cover.

The question now is, upon what terms he can have relief?

The feigned issue, which was awarded by the Supreme Court, upon the judgment in this case, was granted while I had the honour to preside in that Court; and that course was then understood to be the practice of the Court, when a judgment entered by confession was alleged to be affected with usury. And I should have supposed, that if the usury had been found by the jury, (as it was in that case, and upon the evidence now before me,) that the Court would have administered the same equitable relief that is usually granted here, or else have vacated the warrant of attorney, and set aside the judgment, and allowed the party to come in and plead the usury. But from the subsequent proceedings, I am led to infer, that the practice on this subject has been changed since I left that Court, and that all summary interference at law, with judgments upon confession, charged with usury, is now denied.

The history of the practice of the Courts of law, shows the embarrassments attending the subject, and the difficulty of applying a legal remedy, consistently with the rules of law.

In *Middleton* v. *Hill*, (*Cro. Eliz.* 588.) usury was pleaded to a *scire facias*, upon a judgment by confession. The K. B. held the plea bad, for that a judgment was not an *assurance* within the statute, and the defendant should not have suffered a judgment. "And though it may be a practice (*i. e.* bonds with warrants of attorney to confess judgment,) to avoid the statute, yet it shall rather be tolerated, than to avoid judgments upon such suggestions." The case of

1821.

FANNING
v.
DUNHAM.

But where the lender has proceeded at law, and recovered judgment on a bond and warrant of attorney, or is proceeding to foreclose a mortgage by virtue of a power of sale, under the statute, and the borrower files his bill for relief against the judgment at law and other legal securities, on the ground of usury, he must, before he can be entitled to relief, pay, or offer to pay, the principal and interest lawfully due; and that, whether usury be established by proof or be admitted by the answer.

History of the practice of Courts of law, in interfering to set aside judgments by confession on bonds and warrants of attorney, on the ground of usury.

*Rowe* v. *Bellaseys*, (1 *Sid.* 182.) was to the same effect, and decided upon the same authority.

The same point was brought up again in the K. B., in *Bush, assignee of Jones*, v. *Gower*, (*Cases Temp. Hardw.* 220. *Str.* 1043.) when Lord *Hardwicke* presided, and received the same decision. But though the usury could not be reached by a plea to a *scire facias*, upon a judgment confessed, the Court hinted, "that it might be got at, on motion to vacate the judgment." Lord *Hardwicke* discovered great opposition to this mode of shutting out the defence of usury, and observed, that "it opened a door to an evasion of the statutes of usury, and, therefore, as far as the Court could they would come at it" But he said, it could not be done by plea "in that method," for a judgment was not embraced by the words "contracts or assurances;" and he thought it strange, that no words had been ever inserted in any of the statutes against usury, to meet the practice of taking judgment bonds, which had been a contrivance used as early as Queen *Elizabeth's* time. He then threw out a suggestion for consideration, that "judgments of this sort might be set aside in an interlocutory way, as on a motion for ill practice, for the warrant of attorney might be considered as a contract within the statute, and upon this foot might be set aside."

This case was decided in 1736, and it contains probably the earliest hint at the equitable interference, upon motion and feigned issue, which has since, though in a manner unsteady, and fluctuating, prevailed in Courts of law.

In *Machin* v. *Delaval*, in the C. B., (*Barnes' Notes*, 52. 277. S. C.) we have, perhaps, the first precedent of this interference. A motion was made to set aside a judgment, entered upon warrant of attorney, and a feigned issue was awarded to try the fact of usury. At a subsequent term, after the trial of the feigned issue, and a verdict finding that the warrant of attorney to enter up the judgment had been given in consequence of an usurious contract, the Court set

aside the judgment, and directed the warrant of attorney, and *the bond on which the judgment was entered, to be delivered up,* and the plaintiff to pay the costs of the application. This decision carried the remedy, at once, to the utmost length, and further than it has been since carried. For, as Lord *Loughborough* observed, in *The Duke of Bolton* v. *Williams,* (2 *Vesey, jun.* 154.) Courts of law will, upon their general jurisdiction, enter into the validity of a warrant of attorney and judgment, and may vacate the warrant of attorney, and set aside the judgment; but the jurisdiction does not extend to ordering the bond to be delivered up, and if ever done, it has been done inadvertently.

The next case of this kind, arose in the K. B., in *Cook* v. *Jones.* (*Cowp.* 727.) A rule was granted, on the motion of the defendant, to show cause why a judgment entered on warrant of attorney, should not be set aside, on the ground that the consideration of the warrant was usurious. Lord *Mansfield* said, that the party was without relief, unless the Court interposed, and an issue was directed, to try whether the contract, upon which the warrant was given, was usurious.

We have no further report of the case, and are, therefore, unfortunately, without the means of knowing what kind of relief, and to what extent, the K. B. would have granted it, if the issue had been found in favour of the defendant.

In *Matthews* v. *Lewis,* (1 *Anst.* 7.) a motion was made on the common law side of the Court of Exchequer, to show cause why a judgment entered by confession should not be set aside for usury, and even the rule to show cause was denied. The Court admitted, that the K. B. had granted such motions, but that no such practice existed in that Court; and they observed, that to set aside judgments of that kind by a summary jurisdiction of a Court of law, was to usurp the office of a Court of Equity. The introduction of the practice of a feigned issue was rendered necessary by the first innovation

of sustaining the motion. The Court intimated that the relief ought, in such cases, to be limited to the extent to which a Court of Equity goes, which decrees what is really due, and no more; and that if they set aside the judgment, the plaintiff would lose what was really advanced.

This case, as far as the authority of it reaches, shuts out completely, all relief at law after a judgment has been confessed. But we have two subsequent cases upon this subject in the C. B. in which it appears, that they continue to exercise an equitable jurisdiction, in cases of usury, over judgments by confession.

The first of these cases is that of *Edmonson* v. *Popkin*, (1 *B. & Puller*, 270.) in which a motion was made, founded on the preceding decision in *Barnes*, to set aside a warrant of attorney, and the judgment entered thereon, as having been made to secure an usurious loan. The Court did set aside the warrant of attorney and judgment, in order that the question of usury might be tried, which would be shut out, if the judgment was allowed to stand.

This decision was six years after that in the Exchequer; and it shows, that the Exchequer practice on the subject, was considered as peculiar to that Court, and had no influence upon the settled practice of the C. B.

The other case in the C. B. was that of *Hindle* v. *O Brien;* (1 *Taunton,* 413.) upon a like motion the usury was not denied; and the Court therefore said, that there was no ground for an issue; and they proceeded to grant relief, but not to the extent of the case in *Barnes*, nor of that in *B. & Puller*, for the last case seemed to enable the party to plead the usury, and thereby annul the bond entirely. They granted a limited relief, upon the principles of a Court of Equity, by compelling the defendant to do what was equitable, by paying the sum really advanced, with legal interest. It was considered as an application to the equitable jurisdiction of the

Court; and they ordered the money levied on execution to be brought into Court, and referred it to the prothonotary, to take an account generally, of all matters between the parties, and compute the principal and legal interest due to the plaintiff. The case says, the Court also set aside the judgment, but for what purpose does not appear.

We have here a series of decisions, showing, that the Court of C. B. does interfere, to set aside or control judgments by confession, infected with usury; and we have a decision of the K. B. to the same effect, founded on previous suggestions of that Court in favour of such a jurisdiction. The Court of Exchequer is the only Court of common law powers, which has, by a single decision, peremptorily refused to interfere; and, perhaps, that may have arisen from the circumstance, that the same Court has also a distinct equity jurisdiction.

The Supreme Court of this state has, until lately, followed the decisions of the K. B. and C. B. at *Westminster*.

In *Wardell* v. *Eden*, (2 *Johns. Cases*, 258.) the Court said, that the proper way to try the question of usury against a judgment entered by confession was, by awarding a feigned issue; and this was accordingly done, in the cases of *Gilbert* v. *Eden*, (2 *Johns. Cases*, 280.) and of *Slate* v. *Schuyler*. (3 *Johns. Rep.* 139.) In *Hewitt* v. *Fitch*, (3 *Johns. Rep.* 250.) the judgment was set aside, without a feigned issue, as there was no denial of the usury, nor any doubt of the fact.

But it now appears, from the proofs in this case, that after the feigned issue had been awarded and tried, and the usury found, the Supreme Court vacated all these proceedings, and denied all relief to the present plaintiff. The counsel for the defendant have insisted, that the order of the Supreme Court, vacating all the proceedings under the feigned issue, and allowing the defendant to proceed to execution upon his judgment, was to be received here, as a conclusive bar to the charge of usury made and proved in this case : I cannot consider the order in that light. Though

I have not the benefit of the reasons on which the order of the Supreme Court was founded, I cannot possibly suppose, that they acted upon the assumption, that there was no usury in the case, especially after the verdict of the jury finding usury, and which verdict does not appear to have been set aside or questioned. I should rather infer, that the Court were pressed with the difficulty of applying a fit and suitable relief, considering how unstable the *English* decisions had been, as to the nature and extent of that relief; and that they thought it most advisable to follow the doctrine of the Court of Exchequer, and to leave the party to his suit in this Court, and which, in this instance, embraced not the judgment only, but all the claims and securities held by the defendant. I presume the Court acted upon sufficient considerations, but without any intention of deciding or concluding the question of usury, or affecting the title of the plaintiff to relief in equity.

With respect to the relief that can be afforded here, I take the rule to be, that a plaintiff who comes to a Court of Equity for relief against a judgment at law, or other legal security, on the ground of usury, cannot be relieved, except upon the reasonable terms of paying to the defendant what is really and *bona fide* due to him. On the other hand, if the party claiming under such usurious judgment, or other security, resorts to this Court to render his claim available, and the defendant sets up and establishes the charge of usury, the Court will decide according to the letter of the statute, and deny all assistance, and set aside every security and instrument whatsoever, infected with usury. It is perfectly immaterial, in respect to the application of the principle to the case of the debtor who sues here, whether the usury be confessed by the defendant in his answer, or be made out by proof. The plaintiff must still consent to do what is just and equitable on his part, or the Court will not assist him, but leave him to make his

defence at law, as well as he can. The case of *Taylor* v. *Bell*, (2 *Vern.* 171.) is a striking, but very harsh illustration of the rule. The plaintiff had given bonds with sureties, for moneys borrowed at usury, and a warrant to confess judgment, and judgment was entered thereon. He then brought his bill to be relieved, and for an account, and though the answer confessed the facts from which the usury was deduced, relief was denied, and he was ordered to pay principal, interest. and costs. So, in a late case in the Exchequer, (*Skyrne* v. *Ryoot*, cited in *Orde on Usury*, 113.) where a bond and warrant of attorney was taken in an usurious transaction, the decree was, to take an account of the money really paid, and that on payment thereof, the bond and warrant of attorney were to be delivered up. In *Scott* v. *Nesbit*, (2 *Bro.* 641. 2 *Cox*, 183.) we have this strong observation of Lord *Thurlow:* " I take it to be an universal rule," he observes, " that if it be necessary for you to come into this Court to displace a judgment at law, you must do it upon the equitable terms of paying the principal money really due, with lawful interest. I have no idea of displacing a judgment upon any other terms." He directed, in that case, that the judgment should stand as a security for the money actually paid, with legal interest.

The equity cases speak one uniform language; and I do not know of a case in which relief has ever been afforded to a plaintiff, seeking relief against usury, by bill, upon any other terms. It is the fundamental doctrine of the Court. Lord *Hardwicke* (1 *Vesey*, 320.) said, that in case of usury, equity suffers the party to the illicit contract to have relief, but whoever brings a bill, in case of usury, must submit to pay principal and interest due. Lord *Eldon*, (3 *Ves. & Bea.* 14.) after an interval of more than sixty years, declared precisely the same rule. At law, says he, you must make out the charge of usury, and at equity, you cannot

come for relief, without offering to pay what is really due ; and you must either prove the usury by legal evidence, or have the confession of the party. In *Eagleson* v. *Shotwell*, (1 *Johns. Ch. Rep.* 536.) the same rule was followed in this Court, where a party came to be relieved against usury in a mortgage.

I have been thus particular in showing the rule of equity on this subject, because the plaintiff has sought by his bill to have all the securities taken by the defendant, and infected with usury, declared void, and ordered to be cancelled, without offering to pay any thing. His counsel have also contended, at the hearing, that the rule in equity, where the defendant either confesses the usury, or it is established by testimony, is the same as it is when usury is set up as a defence to a demand in law or equity. All that I can do in this case, consistently with my view of the established doctrine of the Court, is, to direct an account to be taken of the dealings between the parties, and to hold the securities which the defendant has taken, to be good only for the balance which may appear to be due to the defendant, after deducting all usurious excess in any of his commissions and charges.

The objection that presses upon the subject is, that the statute of usury may be, in a great degree, eluded, by taking a judgment bond, which precludes the debtor from an opportunity of pleading the usury in a Court of law ; and if he can only be relieved upon the principles of a Court of Equity, or by the summary powers of a Court of law, acting upon equitable principles, the usurious creditor is sure to preserve his principal sum, and the lawful interest. But this objection was for a long time perceived, and felt, and endured in the Courts of law, before any remedy could be applied ; and though they interfered, at first, most effectually, by vacating the warrant of attorney, and allowing the party to come in and plead, they seem now to have abandoned the case to equitable relief, and to choose to

administer no other. It is the folly of the party to have precluded himself from pleading, by confessing judgment. *Leges vigilantibus non dormientibus subveniunt.* At any rate, though it were even to be regretted, that Courts of law cannot place the debtor in a condition to be enabled to annul the contract altogether, under the sanction of the statute ; yet certainly I should introduce a new principle into this Court, if I was now to undertake to displace a judgment at law, upon any other terms than those I have mentioned.

The same objection and difficulty occur in the case of a mortgage taken to secure an usurious loan, with a power to sell, annexed to it, by means of which the creditor forecloses his mortgage by an act *in pais*, without calling upon any Court to assist him. The debtor has no relief in that case, but by applying to this Court, and then he must comply with the terms of paying what was actually advanced. He deprives himself, in that case, by the power to sell, as he does in the other, by his warrant of attorney to confess judgment, of an opportunity to appear in the character of defendant and plead the usury. These are cases in which the party, by his own voluntary act, deprives himself of his ability to inflict upon the creditor the loss of his entire debt. Many other cases may be stated in which the same result will follow. The party is in the same situation, if instead of resisting the usurious claim, he pays it. He cannot then expect assistance to recover back more than the usurious excess. If the warrant of attorney, or the power to sell were procured by fraud, or surprise, or accident, that would form a distinct head of relief, and in no wise applicable to the case. And, perhaps, it is sufficient for the purposes of public justice, and public policy, that the law has enabled a debtor, in every case, in which he does not of his own accord deprive himself of the means, to plead the statute in discharge of his usurious contract, and of his ob-

ligation to pay even what was received, and that in all cases he can, by paying the actual principal received, and the lawful interest, be relieved from the usurious exaction.

The following decree was entered : " It is declared that the promissory notes given by the plaintiff to the defendant, and specified in the writing in the pleadings mentioned, of the 27th of *August*, 1812, and in schedule A. to the said writing annexed, and which remain unpaid, are infected with usury, and that the practice stated in the pleadings of asking and receiving a commission of two and a half per cent. upon the exchange of notes between the parties, or upon negotiable paper endorsed by the defendant, was usurious in every instance in which such commision exceeded the rate of seven dollars, for the forbearance of 100 dollars for one year, or exceeded that rule, for a greater or less sum, for any other period ; and that the pretence set up by the defendant, that the said commissions were taken for and on account of expected deposits of goods for sale at auction, was unfounded in point of fact. And it is further declared to be the established doctrine and practice of the Court, that the plaintiff who seeks the aid of the Court to set aside a judgment at law, or other legal security, on the ground of usury, cannot be entitled to relief, whether the usury be established by proof, or admitted by the answer, except upon the terms of paying the principal and interest lawfully due thereon, after deducting every usurious excess ; and that the judgment, and the mortgage, and the *West Chester* manufacturing stock, held by the defendant in this case, and mentioned in the pleadings, are to be deemed and taken as securities only for the balance that may be due, after such deduction. It is thereupon ordered, &c., that it be referred to one of the masters of the Court to take and state an account of all the loans or endorsements of notes, or advances in cash by the defendant, to or on behalf of the plaintiff, and of all notes given by the plain-

tiff to him in exchange, or for commissions, or otherwise, and stated or referred to in the pleadings and proofs, from the commencement of their dealings as therein stated, and that on such accounting, the master in no case allow any commissions to the defendant beyond the lawful rate of interest declared as aforesaid; and that the defendant be charged with all excess of interest received by him, in the shape of commissions or otherwise, during the course of such dealings; and that he also credit the plaintiff with the amount for which his share or third part of the ship or vessel called the *Tea Plant*, sold for, as admitted in the pleadings, and with all other payments made by the plaintiff, and credited by the defendant, and that he report the balance, if any, remaining due to the defendant upon such accounting, and that interest be charged and allowed on such accounting, when the same would be proper, according to law, and the usage of the Court. And it is further ordered, that the master report to the Court with all convenient speed, and that the question of costs and all further directions be, in the mean time, reserved."