Mr. Justice WOODBURY
 

 delivered the. opinion of the court.
 

 This was an appeal from a decree of the Circuit Court in the Maine District, dismissing a bill which was brought originally by Yeazie, the appellant.
 

 As to the contents of the bill and the evidence m its support, it may suffice to say here, that the bill asked the rescission of a sale at auction, made' about the 1st of January, 1836, of certain mills, owned by the respondents, and a return of the money paid, and the notes still held by them for a. part of the purchase-money. It asked this, on the alleged ground of imposition in
 
 *150
 
 the sale by means of puffing or by-bidding, so as to advance the price about $20,000 above what it otherwise would have been. Tn their answer, the respondents denied any such bidding by their procurement, or that it avoided the sale if happening; and further contended, that they had been discharged from any liability which might have existed by a release to the auctioneer, one of the persons implicated in the by-bidding. The answer insisted, also, that the auctioneer should have been made a party to the bill, and that any claim to relief by the plaintiff is barred by the lapse of time since the sale.
 

 The leading point arising in this case involves so difficult questions both of fact and law, that they have, in some degree, divided this court, as well as the court below, and great care and discrimination will be necessary in order to reach conclusions that can be satisfactory.
 

 The relief here is not sought, as has been objected, on account of inadequacy of price, — though that may at times be so gross as to show fraud, and might here very well raise some presumption of it. Warner
 
 v.
 
 Daniels, 1 Woodb. & Min. 111; Coles
 
 v.
 
 Trecothick, 9 Ves. 234; 2 Ves. sen. 155. But it is sought for a fraud practised in augmenting the price; or, in other words, for taking false steps to enhance it; and it is the consecjuence and injury caused by these unfair means that the plaintiff would avoid.
 

 How far, then, in point of fact, was the price increased above the real bids? and by what means? A minimum price of $ 14,500 is clearly proved to have been fixed by the owners. The weight of the testimony is, that the real bids went only $ 3,500 to $ 5,500 higher. There is no pretence that Wadleigh — the rival or competitor of the plaintiff — bid or authorized others to bid for him above eighteen or nineteen thousand dollars, though a statement of the auctionéer to one pprson has been relied on to the contrary. Wadleigh denies it, — nobody testifies to it, — and nobody is produced who bid or employed others to bid higher, unless the auctioneer himself did it. The true value, also, as fixed b}r the owners at $14,500, tends to confirm the idea that no real, fair bid would be likely to go above $20,000, — or over $5,000 or $6,000 beyond the owners’ own estimate.
 

 It is, then, a leading feature in this case, that should not be overlooked, as it gives a stamp and character to the whole equity as between these parties in favor of the plaintiff, that the respondents fixed the minimum bid for the sale of their property at $ 14,500, and authorized the auctioneer to dispose of it for that amount, when in truth, by some means or other, and
 
 *151
 
 without any real rival bids above $ 20,000, they obtained for it $ 40,000. Whether this extraordinary result was effected by any improper conduct on their part, or that of any agent for whom they may in law be responsible, is the next prominent inquiry.
 

 In the outset, the probability certainly is, that property like, this could not be sold at auction for from § 25,000 to $ 26,000 more than the owner asked for it, unless under some imposition or great mistake. And the further presumption seems at first to be reasonable, that the respondents, whose property was thus sold, and by an auctioneer employed by themselves, and who have benefited by the large excess in the price given, by taking the- money and securities, were either instrumental in causing the excess, or, having availed themselves of it and all its advantages, should be answerable
 
 civiliter
 
 for any wrong and error connected with it.
 

 It is conceded, in point of fact, that some other bids thanVeazie’s went nearly to $ 40,000, and as no person is shown to have made them but the auctioneer, it follows that they must have been real bids by him for himself, or fictitious ones by him, with a view to increase the price to be obtained by the respondents, and to increase his own commissions on a sum so much larger than had been anticipated when the sale began.
 

 Looking to the supposition that the bids were real and for himself, that idea is not supported, but rather' disproved, by the testimony. The auctioneer does not appear to be a man of wealth, able to buy so valuable property for investment, nor was such a purchase in the line of his business or profession, nor does he seem to have had the means or disposition for speculation, and especially on so large a scale ; and he must have well known that the true value of this property was not considered by the owners above $ 14,500, nor its value to Wadleigh as enhanced by its locality in his dispute with'Veazie, as above J 18^00.
 

 ...The weight of the testimony, then, is decidedly against the correctness of the supposition, that the bids above $ 20,000, except i the plaintiff’s, were by the auctioneer for himself and on his own account.
 

 Had it been otherwise, it would be very questionable whether, in point of law or equity, an auctioneer can be allowed to bid off for himself the very property he is selling. It has been laid down that he cannot. Hughes’s case, 6 Ves. 617; Oliver et al.
 
 v.
 
 Court et al., 8 Price, 126; 9 Ves. 234; 8 Ves. 337; Long on Sales, 228; Babington on Auctions, 164. The principles against it are stronger, if possible, and certainly were enforced earlier in courts of equity than of law. An opposite course
 
 *152
 
 would give to an auctioneer many undue advantages. It would tend, also, to weaken his fidelity in the execution of his duties for the owner. He woiild be allowed to act in double and incon- . sistent capacities, as agent for the seller and as buyer also.; and the precedents are numerous holding such sales voidable, if not void, and at all events unlawful, as opposed to the soundest public policy. See Michoud
 
 v.
 
 Girod, 4 Howard, 554; 15 Pick. 30; 1 Mason, 344; 2 Johns. Ch. 51; Tufts
 
 v.
 
 Tufts, Mass. Dist. 1848, and cases there cited; Long on Sales, 228; 9 Paige, 663; 1 Stor. Eq. Jur., § 315; 3 Stor. R. 625. That an auctioneer is a general agent for the owner usually, though questioned in the argument, cannot be doubtful. See Howard
 
 v.
 
 Braithwaite, 1 Ves. & Beam. 209; Stor. on Agency, §§ 27, 28; 4 Burr. 1921; 1 H. Bl. 85. He is so till the sale is completed. Long on Sales, 231; Seton
 
 v.
 
 Slade, 7 Ves. 276; Babington on Auctions, 90; 20 Wendell, 43. And though he may be agent of the buyer after the sale for some purposes, suchas to take the case out of the statute of frauds, (Williams v. Millington, 1 H. Bl. 84; 3 D. & E. 148; Cowp. 395; Long on Sales, 228, 60, 63; Emerson
 
 v.
 
 Heelis, 2 Taunt. 38; 1 Esp. 101,) yet this does not affect the other principle, that till the sale, and before it, he acts for the vendor alone. Nor is an auctioneer a public officer in Maine, and a license required to him. 2 Laws of Maine, p. 390, ch. 134. But whether a public officer or not is a circumstance that does not generally appear to have changed the liability of the principal for his acts, if taking the benefit of them.
 

 Treating his bids, then, as made by the auctioneer, not for himself, and the proof having failed to show that they were for a stranger, the only remaining hypothesis is, that they were made by him while agent of the owners, with a view to their benefit particularly, though with hopes of some incidental gain to himself in increased commissions. How does this view accord with the evidence of the transaction, taken as a whole ? It is the only plausible aspect of it existing. The auctioneer found Wadleigh willing, on account of his quarrel with Veazie and his interests near the property, to go about $ 5,000 higher than the owners’ estimate, and then found Veazie, for like reasons, willing to. go still higher rather than let Wadleigh purchase the premises, for whom he supposed the auctioneer was bidding. Ip the eagerness of competition and with ample capital, Veazie seems in this way
 
 to
 
 have been induced
 
 to
 
 go even as high as $ 40,000, under the exciting but delusive and false impression, that he thus was obtaining the property against the efforts of Wadleigh or others, real bidders and real competitors. That
 
 *153
 
 impression the auctioneer sought to create, and did create, by deceptive means.
 

 Residing on the spot and acquainted with the character of the parties, he doubtless suspected that Yeazie, rather than let the property go to Wadleigh, might bid very high, — and perhaps, by rumor, even to §40,000, — and proceeded, after the real bids were over at about § 20,000, to make by-bids, either on his own judgment, to benefit his employers and increase his own commissions, or on the suggestions or signs of Stephen H. Williams, who was present as agent of the respondents/ and is proved to have sat behind and near the auctioneer at the sale.
 

 Yeazie being thus situated so as to be more easily duped by either of them, and his condition and fears and anxieties being probably known to Head* if not to Stephen H. Williams, the auctioneer, by the means before described, procured for his employers nearly treble what they expected or what had been agreed on as the minimum price. The next inquiry is, if such a transaction renders the sale in point of law void, either for fraud or mistake. In some countries, under the civil law, a buyer of immovables is of right entitled to a rescission of the sale if it turn out, though without fraud, that the price was more than fifty per cent, above the true value. Pothier on Contracts of Sale, part 5, ch. 2, sec. 2; and see Domat, tit. 6, sec. 3. Here the price was at least a hundred per cent, above, — yet there must in this country be fraud also, or a mistake.
 

 Though no evidence is seen of fraud practised by the respondents in person, nor by their express directions, yet a fraud was evidently perpetrated by the auctioneer, as agent for the respondents, or by him in connection with Stephen H. Williams, and the respondents have taken and still retain the benefit of it. This conclusion is indisputable, whatever obscurity or concealment may have been flung over the. case by the auctioneer.
 

 Does this state of things, then, in point of law, require the sale to be relieved against, .on sound principles of equity and public morals ?
 

 By-bidding or puffing by the owner, or caused by the owner, or ratified by him, has often been held to be a fraud, and avoids the sale. Cowp. 395; 6 B. Monroe, 630; 11 S. & R. 86; 4 Har. & McHen. 282; Babington on Auctions, 45; 3 Bingh. 368; 2 Carr. & Payne, 208; 6 D. & E. 642; Rex
 
 v.
 
 Marsh, 3 Younge & Jerv. 331; 11 Moor, 283. He may fix a minimum price, or give notice of by-bids, and thus escape censure. Ross on Sales, 311; Howard
 
 v.
 
 Castle, 6 D. & E. 642.
 
 *154
 
 But this shows that, without such notice, it is bad to resort to them. Crowder
 
 v.
 
 Austin, 3 Bingh. 368; 3 Younge & Jerv. 331. “ The act itself is fraudulent,” says Lord Tenterden. Wheeler
 
 v.
 
 Collier, 1 Moody & Malk. 126.
 

 The by-bidding deceives, and involves a falsehood, and is, therefore, bad. It violates, too, a leading condition of the contract of sales at auction, which is that the article shall be knocked off to the highest real bidder, without puffing. 2 Kent’s Com. 538, 539. It does not answer to apologize and say that by-bidding is common. For, observed Lord Mansfield, “ Gaming, Stockjobbing, and swindling are frequent. But the law forbids them all.” Cowp. 397. In Bexwell
 
 v.
 
 Christie, Cowp. 396, the pole-star on this whole subject, it is said, — “ The basis of all dealings ought to be good faith. So more especially in these transactions, where the public are brought together in a confidence that the articles set up for sale will be disposed of to the highest real bidder.”
 

 Even in a court of law, Lord Kenyon has, with true regard to what is honorable and just, said, — “ All laws stand on the best and broadest basis, which go to enforce moral and social duties.” Pasly
 
 v.
 
 Freeman, 3 D. & E. 64. See also Bruce
 
 v.
 
 Ruler, 2 Man. & Ryl. 3. And in Howard
 
 v.
 
 Castle, 6 D. & E. 642, he held that Lord Mansfield’s doctrine, that all sham bidding at auctions' is a fraud, was a doctrine founded
 
 “
 
 on the noblest principles of morality and justice.”
 

 Nor does it lessen the injury or the fraud if the by-bidding, .be by the auctioneer himself. He, being agent of the owner, is equally with him forbidden by sound principle to conduct clandestinely and falsely on this subject. Cowp. 397. All should be fair,—above-board.
 

 •Indeed, in point of principle, any fraud by auctioneers is more dangerous than by owners themselves. The sales through the former extend to many millions annually, and are distributed over the whole country, and the acts accompanying them are more confided in as honest and true than acts or statements made by owners themselves in their own behalf, and to advance their own interests. Great care is therefore proper to preserve them unsullied, and to discourage and repress the smallest deviations in them from rectitude.
 

 Here the auctioneer virtually said to his hearers, when he made a fictitious bid, — “I have been offered so much more for this property.” But he said it falsely, and said it with a view to induce the hearers to offer still more. He averred it as a fact, and not an opinion; and as a fact peculiarly within his knowledge. Now if, under such an untrue and fraudulent as
 
 *155
 
 sertion, persons were persuaded to give more, — relying, as they had a right to, on the truth of what was thus more within the personal knowledge of the auctioneer, and was publicly and expressly alleged by him, and being of course more willing to give higher for what others had offered more, who probably were acquainted with such property and had means to pay for it, — they were imposed on and injured by the falsehood. It is said, — “ A naked, wilful lie, or the assertion of a falsehood knowingly, is certainly evidence of fraud.” 1 Const. R. (S. Car.) 8. The following authorities support the views here laid down. 3 Younge & Jerv. 331; Moody & Malk. 123; 2 Carr. & Payne, 208; Bexwell
 
 v.
 
 Christie, Cowp. 395; Howard
 
 v.
 
 Castle, 6 D. & E. 642; 1 Hall, (N. Y.) 146; 1 Dev. (N. Car.) 35; 6 Clark & Fin. 444, 329.
 

 Some cases, and some reasoning found in them, attempt to sanction a contrary doctrine, if the by-bids were made merely to prevent a sacrifice of the property, — a “ defensive precaution,”— but not otherwise. Connolly
 
 v.
 
 Parsons, 3 Ves. 625, note; Smith
 
 v.
 
 Clarke, 12 Ves. 477; Steele
 
 v.
 
 Ellmaker, 11 Serg. & Rawle, 86; Woodward
 
 v.
 
 Miller, 1 Collier, 279; 5 Maddock, 34.
 

 These exceptions still concede that the by-bidding, when an artifice to mislead the judgment and inflame the zeal of others, —
 
 “
 
 to screw up and enhance the price,” in the language of Sir William Grant,—is fraudulent and makes the sale void. 12 Ves. 483; 2 Kent’s Com. 537.
 

 Some cases hold, too, that the by-bidding will not vitiate, if real bids beside those of the vendee occurred after. 3 Ves. 620. But neither of these excuses or apologies existed here. These by-bids were made after some thousands of dollars had been offered over the value of the mills, as estimated by the owners themselves, and were palpably made
 
 “ to screw up,”
 
 or enhance the price. Any other excuses, which have ever availed, either are anomalies, or rest on a false analogy. Thus, atone time in England duties on auctions were remitted, if the property was bought in by the owner. 3 Ves. jr. 17, 621; 1 Fonbl. Eq. 226. This, however, was founded on the theory that no sale had taken place, and hence no duty should be paid, rather than that a sale under such circumstances was valid. It, therefore, strengthens rather than impairs the view taken of the present case.
 

 It is no answer to this reasoning to say, as has been done, that Veazie bid voluntarily, or expressed satisfaction with his purchase, and was in haste to close it up. Because,-in all this, he was laboring under a misapprehension that others
 
 *156
 
 bad honestly valued the property near the same price, and been in truth as anxious as himself to bid it off, — and because he believed that he had thus succeeded against a real rival in securing the mills and some incidental advantages, — when in reality there had been no such honest bids over $ 20,000, and he had been contending against a man of straw falsely set up by the auctioneer. In short, he had been imposed on by the agent of the respondents; and that by virtual falsehood, and in a point material, and in a manner likely to mislead. He was not allowed to exercise his judgment, and bid higher or not on the truth, — on facts, — but on falsehoods. 6 D. & E. 644. He was not the highest bidder at $ 40,000, except through deception wrought on him fraudulently. Ibid. Secrecy was practised, — privacy as to the real offers, — stratagem, — which, as already seen, is in the teeth of the great principles of a valid public sale. Bexwell
 
 v.
 
 Christie, Cowp. 396; 2 Kent’s Com. 539.
 

 A technical objection to the quantity rather than weight of the evidence has been urged, which it may be well to dispose of here. It is said that' fraud is denied as to the defendants, and is .not proved against them by two witnesses. It is conceded that the denials that the respondents were personally guilty o’f fraud, or expressly directed falsehood and fraud, are not overcome, nor are they in controversy. But it is the puffing or by-bidding of the' auctioneer, their agent, which is in controversy as a fact. As to that they can make no denial from, any personal knowledge pro or con, —not having been present-; 'and hence their answer furnishes no evidence in respect to it, as an independent fact. But this fact being substantiated by the agent, and the matter proved by others, as to no real bids being made over $ 20,000, and by' various other circumstances in the case, the amount of evidence for it is ample. It is true, they deny that they ordered it. It is to be remembered, however, that they are not held liable here merely by declarations of their agent, when not ordered by them or perhaps known to them at the time, — though it is a sound doctrine that the verbal declarations of an agent at a sale often bind the principal. 1 Ves. & Beames, 209; 6 Clark & Fin. 448, 449; Story on Agency, § 107. And that the agent is bound to disclose all and to act as the principal is when present, and selling. 1 Metcalf, 560; Hough
 
 v.
 
 Richardson, 3 Stor. R. 698; 3 Hill, 260; 1 Woodbury & Minot, 353. And that a principal so acting in person cannot be justified in asserting what is false, and by which another is injured. Pasly
 
 v.
 
 Freeman, 3 D. & E. 51; Vernon
 
 v.
 
 Keys, 12 East, 632; 2 East, 92. And that what the
 
 *157
 
 vendor may not do in person, or may not employ others to do in his absence, — that is, make by-bids to enhance the price, — his agent, the auctioneer, cannot rightfully do.
 

 But they are held liable on a ground beyond and apart from all this, and as well settled in England as here, that if a principal ratify a sale by his agent, and take the benefit of it, and it' afterwards turn out that fraud or mistake existed in the sale, the latter may be annulled, and the parties placed
 
 in statu quo ;
 
 or they may, where the case and the wrong are divisible, be at times relieved to the extent of the injury.
 

 The principal in such case is profiting by the acts of the agent, and is hence answerable
 
 civiliter
 
 for the acts of the agent, however innocent himself of any intent to defraud. 13 Wendell, 513; 1 Verm. 239; 1 Salk. 289; 7 Bingh. 543; Mason et al.
 
 v.
 
 Crosby et al., 1 Woodb. & Min. 342, and cases there cited; Doggett
 
 v.
 
 Emerson, 1 ib. 1; Story on Agency, § 451; Doggett
 
 v.
 
 Emerson, 3 Stor. R. 700; Olmsted et al.
 
 v.
 
 Hotailing, 1 Hill, 317; Taylor
 
 v.
 
 Green, 8 Carr. & Payne, 318. Whether the principal knew all those acts or not, is not the test in this case, as in 2 East, 92, notes, and 13 East, 634, note, though it may be in some others, as in 5 Bingh. 97; 6 Clark & Fin. 444.
 

 But the test here is, Was the purchaser deceived, and has the vendor adopted' the sale, made by deception, and received the benefits of it ? For, if so, he takes the sale with all its burdens. Wilson
 
 v.
 
 Fuller, 3 Adolph. & Ell. (N. S.) 68.
 

 The sale, thus made here, was adopted and carried into effect by the respondents; and hence, on account of the fraud involved in it, they should either restore the consideration, and take back the mills, or indemnify the purchaser to the extent of his suffering.
 

 Some miscellaneous objections to these results are yet to be considered. It is said to be justly deemed an extraordinary power in a court of chancery to rescind contracts at all, instead of leaving parties tó a suit at law for their damages. Sugden on Vendors, 392; 11 Peters, 248. And that a fraud or mistake must be very manifest to justify it. 10 Price, 117; 13 Price, 349; 7 Cranch, 368; 2 Johns. Ch. 603; 12 Ves. 477. And that the burden of proof to show these grounds for a rescission rests on the plaintiff, and not on the defendant. Grant this. Yet all requirements appear fulfilled here. On satisfactory proof, also, executed, as well as executory, contracts may in such cases be set aside. One case is reported of its being done after twenty years. 8 Price, 125. And a defendant is likety, in moat cases,
 
 *158
 
 to suffer no more by a rescission in chancery, than by damages adequate to the loss or injury.
 

 There is next the objection, that too long a time had elapsed here before seeking redress. More force would attach to this if Veazie had discovered the imposition sooner. The sale happened January 1st, 1836; the discovery of the fraud was after January 1st, 1840, and this bill was filed July 23d, 1841, after demanding redress of the respondents in January, 1841.
 

 Having effected his object in the purchase, — to obtain the property rather than let his rival get it, who, he doubtless supposed, was bidding against him, — and being a man of ample means, Veazie submitted, as feeling bound, to the excess of price. Nor did he suspect any imposition till informed of it within a few years;' and then he seasonably applied for relief, and should not be barred from obtaining it by any lapse of time while the fraud or mistake as to the bids not being real remained undiscovered. Doggett
 
 v.
 
 Emerson, 3 Stor. R. 740; Daniels
 
 v.
 
 Warner, 1 Woodb. & Min, 90; Doggett
 
 v.
 
 Emerson, Ibid. 1; 8 Clark & Fin. 651; 1 Russ. & Milne, 236.
 

 ' It is said that, after this lapse of time, the plaintiff is not in a proper condition to restore the mills. 16 Maine, 42. He is less likely to be, if they are ordered to be restored; but that is the fault of the fraud, and the concealment of it, rather than his fault. The defendant, too,'if the property has deteriorated in value, is in no worse a condition than he would be Where an avoidance of the sale takes place at law for fraud.
 

 If the plaintiff has sold the property, or disabled himself from restoring it, when ordered by a decree, then the evil consequences will light on himself, and not the defendants. That is what is meant by inability to restore the property in 8 Cranch, 476. Nor is there anyneed he should aver substantively in his bill that he can restore it, this being presumed as a usual, if not necessary, consequence, when he applies to have the contract rescinded, and every thing placed
 
 in statu quo.
 

 The last exception to a recovery here by the plaintiff is, that the release to Head, the auctioneer, should be considered as discharging the respondents also. Neither the design of the parties to the release, nor the agreement or consideration to make it, extended beyond the auctioneer. It was suicidal for the plaintiff to pay for a release to get a witness in a case, which release would destroy the case itself. (2 Iredell, 219.) Sitting as we do in a court of equity, we cannot, without an open and gross departure from equity, give to the release any effect beyond the design in making it, and the literal words of it, reaching
 
 *159
 
 only to the discharge of the releasee. It is a strict rule at law; and not of equity, which goes further in any case. 7 Johns. Ch. 207; 18 Wendell, 399; 22 Pick. 308. The operation was meant to be like a covenant not to sue him; and such a covenant is no bar to suing others when jointly liable. Ferson
 
 v.
 
 Sanger, 1 Woodb. & Min. 138.
 

 Again, in the present instance, there was no joint liability at law by the respondents and the auctioneer. Their accountability was separate, and resting on different grounds; his on actual falsehood, — theirs on the adoption of the benefits of it, and the accountability thus arising for it. The release of one, therefore, is not like the release of a joint contractor or joint trespasser. 1 Anstruther, 38.- And in equity it may well be limited to the person released, and the person paying the consideration for it. Hopkins, 251, 334.
 

 Beside this, Head was in law. a competent witness for Yeazie, without any release, his interest being against Yeazie. This conclusion as to the release is an answer, likewise, to the objection, that Head ought to have been made a party to this bill. His liability resting on a separate ground, and not joint, he could not be united at law, nor is it always done in equity under like circumstances. See Mason et al.
 
 v.
 
 Crosby, 1 Woodb. & Min. 342; Ferson
 
 v.
 
 Sanger, Ibid. 138; Jewett
 
 v.
 
 Conrad, 3 Woodb. & Min.-; Small
 
 v.
 
 Atwood, 6 Clark & Fin. 352, 466.
 

 All that remains is to decide upon the most equitable course to carry these views into effect, consistent with sound principles.. One mode is .to set aside unconditionally the whole sale, for the fraud practised in it, and have the mills reconveyed by Yeazie, and the money, notes, and mortgage returned by the respondents. Another mode is to treat as unjust only so much of the proceedings as was fraudulent; that is, the excess of price over $20,0D0 obtained by by-bidding, and to cause that excess only to be refunded.
 

 To attain this last result in some way is preferable, considering the length of time which has elapsed here, and the probable deterioration in value of the mills by use and the fall of prices in the market since the inflation of 1836, and, though objected to by the respondents, is likely more than the other to secure them against loss.
 

 To restore the excess of consideration, or to restore all and have back the mills, has in other respects much the same effect. The plaintiff in either way will obtain nothing which did not belong to him, nor the respondents lose any thing which was theirs before the falsehood or mistake. It is, at the same time,
 
 *160
 
 gratifying to find, that, by either of these courses, no incidental loss or inconvenience will fall on the respondents, except what has been occasioned by the misbehaviour of their own agent, and the fruits of which they accepted, and which they cannot
 
 in foro conscientioB
 
 retain against those injured by that misbehaviour.
 

 But there is one equitable operation before named, in relieving only as to what 'is fraudulent, which makes it most desirable, if legal. It is objected, first, that it will be giving damages, like a court of law, to the extent of the wrong, rather than rescinding the whole contract on account of fraud or an evident mistake.
 

 We are inclined to think, unless under peculiar circumstances, that damages cannot be given in a court of equity, but the parties must be left to a court of'law to recover them. 17 Ves. 203; 1 Russ. & Mylne, 88; 2 Keen, 12; 1 Cowen, 711; 5 Johns. 193. The exceptions of damages in part, under certain circumstances may be seen in the following cases, and the authorities there quoted. 2 Story’s Eq. Jur., §§ 711, 779, 788, 794; 4 Johns. Ch. 460; 14 Ves. 96; 9 Cranch, 456.
 

 But the course we propose, to have the sale stand so far as not fraudulent, and to make the defendants restore only what was obtained by the puffing and fraud, is not giving damages either
 
 eo nomine
 
 or in substance. It requires to be surrendered merely the' money and interest on it, and the notes and mortgage unpaid, which were obtained by the deception of by-bidding. -This, among other things, is prayed for in the bill. This course will, only carry out the established rule on this subject, laid down in elementary treatises, — that
 
 “the
 
 injured party is placed in the same situation, and the other party is compelled to do the-same acts, as if all had been transacted with the utmost good faith.” 1 Story’s Eq. Jur., § 420; 1 Maddock’s Ch. Pr. 209, 210; Fonbl. Eq., book 1, ch. 3 and 4,
 
 notes.
 

 Every thing is thus relieved against, to the extent to which it is wrong or fraudulent, but nothing beyond it. Jopling
 
 v.
 
 Dooly, 1 Yerger, 289.
 

 It is suggested, however, secondly, that this course does not set aside the whole sale; or whole. contract, which ought to be done, if intermeddled with at all. It is true that, generally, a part of a deed, or contract, or sale, camjot be avoided without avoiding the whole. 2 Ves. jr. 408; 1 Maddock’s Ch. 262. Though, at times there may be a division or break in them where fraud begins and good faith ends, and where beyond that line only it would seem just to annul them. (1 Yerger, 289.)
 

 
 *161
 
 But if the whole must be annulled or hone, it can be here, and yet equitable terms imposed on the plaintiff to let such part of the transaction remain undisturbed as is consistent with equity and good faith. This is justified, not only by the general principle that he must do equity who asks it, (4 Peters, 328,) but that it is one of the leading principles on this particular subject in a court of chancery,
 
 “
 
 if it should
 
 rescind
 
 the contract, to allow it only upon terms of due compensation, and the allowance of countervailing equities.” 2 Stor. Eq. Jur., § 694; Harding
 
 v.
 
 Handy, 11 Wheat. 126; Bromly
 
 v.
 
 Holland, 5 Ves. 618.
 

 So it is said, that, “ when the judgment debtor comes into court, asking protection, on the ground that he has satisfied the judgment, the door is fully open for the court to modify or grant his prayer upon such condition as justice demands.” The Mechanics’ Bank of Alexandria
 
 v.
 
 Lynn, 1 Peters, 384.
 

 This court on its equity side, says Chief Justice Marshall, ia. “ capable of imposing its own terms on the party to whom- it grants relief.” Mar. Ins. Co.
 
 v.
 
 Hodgson,
 
 7
 
 Cranch, 336, 337. And it will not grant relief even in fraud, unless the party “wishing it will do complete justice.” Payne
 
 v.
 
 Dudly, 1 Wash. (Va.) 196;
 
 Semb.,
 
 1 Johns. Ch. 478; Scott
 
 v.
 
 Nesbit, 2 Cox, 183. Here, then, in the decree, we can set aside the whole sale and contract; but, instead of doing it unconditionally, the plaintiff should,.be required first to do equity, and to allow any countervailing equities on the part of the respondents, -— which are, to let the sale itself stand at what was fairly bid for the property, and require only the residue of the consideration, being entirely fraudulent, to be restored. 1 Stor. Eq. Jur., §§ 344, 599, and cases there cited; McDonald
 
 v.
 
 Neilson, 2 Cowen, 139, 192.
 

 Thus, a borrower of money on usury will not be allowed relief in chancery, except on the payment of principal and legal interest. Scott
 
 v.
 
 Nesbit, 2 Cox, 183; 2 Bro. Ch. Cas. 649; 2 Stor. Eq. Jur., § 696; Stanly
 
 v.
 
 Gadsby, 10 Peters, 521; Jordan
 
 v.
 
 Trumbo, 6 Gill & Johns. 106; 3 Ves. & Beames, 14; Fanning
 
 v.
 
 Dunham, 5 Johns. Ch. 143. Like terms are imposed on borrowers under void annuity bonds. (See same cases.) So, by analogy, the cases of specific performance frequently exhibit the enforcement of a part only, when just. Pratt et al.
 
 v.
 
 Law et al., 9 Cranch, 456; Hargrave
 
 v.
 
 Dyer, 10 Ves. 506; Harnett
 
 v.
 
 Yielding, 2 Sch. & Lefr. 55; 1 Maddock’s Ch. 431. So, in respect to injunctions, one may issue against a judgment for land, and stay execution for a part, and allow it to stand for the residue. Dunlap et al.
 
 v.
 
 Stetson, 4 Mason, C. C.
 
 *162
 
 364. See other illustrations and cases, Com. Dig., Chancery Appendix, 6 and 18; Fildes
 
 v.
 
 Hooker, 2 Meriv. 427; 14 Ves. 91; Wharton
 
 v.
 
 May, 5 Ves. 27.
 

 The form of a decree nearly adapted to this case may be seen in Fanning
 
 v.
 
 Dunham, 5 Johns. Ch. 146.
 

 The last real bid here being in some doubt as to its amount, whether eighteen or twenty thousand dollars, we think the weight of ‘evidence is in favor of the last sum, and the computations aré therefore to be made on that basis. The judgment below must therefore be reversed, and a mandate sent down directing the proper decree, in conformity to these views, to be entered for the plaintiff.
 

 Mr. Chief Justice TANEY, Mr. Justice McLEAN, and Mr. Justice GRIER dissented from this opinion.
 

 Order.
 

 This cause came on to be heard on the transcript of the record from, the Circuit Court of the United States for the District of Maine, and was argued by counsel. . On consideration whereof, it is the opinion of this court, that the pretended sale of the two mill privileges, at and for the sum óf $ 40,000, as set forth and described in the pleadings and proofs in this cause, was fraudulent, and should be set aside; but as equitable terms imposed on the complainant, he is to let the sale stand for the sum of $ 20,000, fairly bid by him ; and that the balance of the moneys paid by the complainant over and above the said, $ 20,000 should be .refunded to him by the defendants, with legal interest thereon, and that the notes and securities given for the payment of any part of such excess should be cancelled and given up by the defendants to the complainant; that the defendants should pay the costs in this court, upon this appeal, and all the costs which have-accrued in this cause in the said Circuit Court, or which may accrue therein, in carrying out the decree of this court.
 

 Whereupon, it is now. here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court dismissing the complainant’s bill be, and the same is hereby, reversed and annulled. And this court, proceeding to render such decree as the said Circuit Court ought to have rendered'herein, doth now here qrder, adjudge, and decree, that the aforesaid sale, as above set forth, be, and the same is hereby, rescinded and set aside; that the said complainant shall, as equitable terms, retain the said property at and for the said sum of $ 20,000, part of the moneys paid by him to the said defendants, and that
 
 *163
 
 the said defendants shall, on or before the third day of that term of the said Circuit Court next ensuing the filing the mandate of this court in said Circuit Court, refund and pay' to the complainant all such sums of money over and above the said last-mentioned sum of $ 20,000, as they or either of them shall •have received from the said complainant on account of the purchase of said property, together with legal interest thereon from the time or times at which they were so received by the said defendants, and that the said defendants shall, on or before the same day- of the same term of the said Circuit Court, cancel and deliver up the notes and securities given for the payment of any and every portion of the excess over and above the said $ 20,000. And this court doth further order, adjudge, and decree, that the said defendants do pay the costs in this court upon this appeal, and all the costs which have accrued in. this cause in the said Circuit Court, or which may accrue therein, in carrying out the decree of this court. And-this court doth further order, adjudge, and decree, that this cause be, and the same is hereby, remanded to the said Circuit Court, with instructions to carry this decree into effect, and with power to make all such orders and decrees as may be necessary for that purpose.