R. HARRIS & CO. v. WELLER et al.

(Court of Appeals of District of Columbia. Submitted April 4, 1922. Decided May 1, 1922.)

No. 3725.

1. Brokers ⊙106—Evidence held to show purchaser knew it was paying agent's commission.

Where the original contract for the sale of a building provided that a portion of the sum paid should apply on account of the purchase price, and $10,000 on fee charged, and a subsequent agreement stated the purchase price at $10,000 less than the former, but the vendor's agent required settlement on the basis of the original contract price, the purchaser's attorneys must have known that the contract required them to pay the agent's commission, which is not an unusual provision in contracts, though the commission is customarily paid by the vendor.

2. Vendor and purchaser ⊙341(1)—Delay of one year in seeking damages arising from sale held to bar relief.

The right of a purchaser to relief against an excessive purchase price exacted from him in the purchase of a large building, where the purchaser's representatives were business men, who knew that delay in a transaction of that magnitude would be almost certain to prejudice the rights of a former owner, is barred by a delay of one year in seeking relief.

3. Landlord and tenant ⊙81½, New, vol. 15A Key-No. Series—Expectation of renewal of lease is not property right as between the parties.

The expectation by a tenant that the landlord would renew his lease at the expiration of its term is not, as between the landlord and tenant, a valuable property right, though it may give the tenant a right against interference therewith by others.

4. Vendor and purchaser ⊙35—Owner has right to remain undisclosed.

Equity will grant no relief to a purchaser because the owner remained undisclosed, as he had a right to do, even though the purchaser might have made a better trade with the owner, if the latter had been disclosed.

5. Brokers ⊙102—Fact that agent exacted for principal more than the latter's minimum price is no ground for relief.

The fact that the agent for the undisclosed owner of a building demanded on behalf of his principal, and received from the purchaser, a larger price for the building than the minimum for which the vendor would

sell, and in addition required the purchaser to pay his commission, which was fixed at a reasonable amount, does not entitle the purchaser to equitable relief.

**6. Vendor and purchaser ☞334(7)—Purchase price held not excessive.**

Where the tenant of the ground floor of a building, for whom the location possessed peculiar value, paid for the building a sum which exceeded by $115,000 the amount paid for the building by his vendor a short time before, but his vendor had made a good-faith offer of $100,000 for the immediate cancellation of the lease, the price paid by the purchaser was not excessive.

**7. Vendor and purchaser ☞122—Contract cannot be rescinded in part only.**

A contract of sale cannot be avoided in part only, though whenever the point at which fraud begins clearly appears, there may be such a division.

Appeal from the Supreme Court of the District of Columbia.

Suit by R. Harris & Co., a corporation, against Joseph I. Weller and others. From a decree dismissing the bill, plaintiff appeals. Affirmed.

D. W. O'Donoghue and A. A. Alexander, both of Washington, D. C., for appellant.

Stanton C. Peelle and C. F. R. Ogilby, both of Washington, D. C., for appellees.

ROBB, Associate Justice. The appeal is from a decree dismissing plaintiff's bill for relief, growing out of the purchase by it of the Jenifer Building, so called, a six-story brick store and office building located at the northwest corner of Seventh and D Streets, Northwest, in this city. The facts, as detailed by the bill, are substantially these:

Plaintiffs and their predecessors, for approximately 25 years, had conducted a jewelry store under the name of R. Harris & Co., occupying for this purpose the first floor and basement of the Jenifer Building, which for some time (the exact period not being mentioned) was owned by Miss Josephine Davis, one of the defendants. On March 11, 1915, plaintiff's immediate predecessor entered into a written lease of that portion of the building occupied by the firm for the term of 5 years, beginning March 1, 1916, and the lease was duly recorded. This lease "was in effect a renewal of a then existing lease agreement, which, in turn, was in effect a renewal of a still prior lease agreement." The owner of the building "was in the habit of renewing and extending or giving a new lease, from time to time," and this "was a very valuable asset" of the business. In May of 1915 Abraham D. Prince, who prior to that time had conducted the business under the name of R. Harris & Co., died, and his daughters, as devisees and legatees under his will, sold to the plaintiff corporation the personal property and good will of the business "and the unexpired lease, * * * which included the expectancy" that at the expiration of the lease it would be renewed or a new lease given. Plaintiff, desiring to continue business in the same location after the expiration of the lease, communicated with the owner of the building, Miss Davis, in the early part of the year 1919, looking to the renewal of the lease. Plaintiff was referred to Henry E. Davis, Esq., the brother of Miss Davis, who, "after several months of

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

negotiation," and after he had informed plaintiff that a new lease or renewal would be given, finally, on April 18, 1919, "informed plaintiff that no definite promise for a new lease or renewal of lease could be given," and shortly thereafter Mr. Davis informed plaintiff that the building had been sold by his sister, "and, without informing plaintiff of the name of the alleged purchaser, told plaintiff that in the matter of said alleged sale his said sister was represented by the defendant National Savings & Trust Company, or by its president, the defendant William D. Hoover, and that the alleged purchaser in said alleged purchase was represented by the defendant Joseph I. Weller." Plaintiff was further informed that the new purchaser "would, no doubt, give plaintiff a new lease, * * * to take effect on the expiration of its then existing lease." Mr. Hoover was consulted, but he refused to give plaintiff any information as to the identity of the new purchaser, other than to inform plaintiff that Mr. Weller, a local lawyer and real estate broker, represented the purchaser.

On April 14, 1919, plaintiff received a letter from Mr. Weller, who stated that he recently had negotiated the sale of the Jenifer Building, and asked whether plaintiff would consider a proposition to cancel its lease and give possession in about 60 days from date; that, if this could be accomplished, the purchaser desired to remodel the building in time "for the fall business of 1919." Thereafter, on April 27, 1919, plaintiff meanwhile having sought a renewal of the lease, Mr. Weller wrote plaintiff that his client, the new owner, had purchased the property for the purpose of occupying it, "and they therefore would not be interested in tying up a large amount of money in a building merely to lease it to some one else"; that he expected to have an answer from the purchaser as to whether the purchaser would be willing to sell it. He further stated that, if plaintiff was "willing to accept $100,000 cash to cancel the existing lease, and to give possession on July 1st," he was of opinion that his party would be willing to give it. This letter was followed by efforts on the part of plaintiff to effect the purchase of the property.

On May 17, 1919, there was recorded a deed, dated May 15, 1919, from Miss Davis to the defendant Helma M. Erickson, a clerk in the office of Mr. Weller and without financial resources. The consideration for this transfer was $75,000 cash and $225,000 secured by deed of trust, in which Mr. Davis, Mr. Hoover, and Mr. Weller were named as trustees. On July 9, 1919, there was recorded a deed in trust, dated June 30, 1919, conveying the Janifer Building to the United States Mortgage & Trust Company, a New York corporation, with its principal place of business in New York City. Under this deed of trust the trust company was empowered to lease, sell, or mortgage, or otherwise dispose of, the Jenifer Building.

In June of 1919 plaintiff employed Alexander Wolfe, a local attorney, "to represent it in negotiations with the defendant Weller to purchase the Jenifer Building." Mr. Wolfe undertook this service, and, after some preliminary negotiations, on October 20, 1919, he wrote Weller, who previously had offered to submit a bid of $410,000 to his client, that he (Wolfe) had had numerous conversations with his clients,

and that they took the position "that the price of $410,000 is an excessive price for this property." Mr. Wolfe said, however, that acting under his advice they finally had agreed, if Weller could give positive assurance that the property could be purchased for that sum, to authorize Wolfe to accept the offer, and that he was inclosing an agreement to that affect and a deposit, in the form of a check, for $10,000. On the 23d of October following, Weller, as agent for the owner, sent Wolfe an acknowledgment of the receipt of the check "under sale contract dated October 23, 1919, setting forth the purchase price of said property at $410,000, with the terms as set forth in said contract, provided said contract is approved, and, if not approved, that the said sum of $10,000 be returned to R. Harris & Co. within a period of five days from date hereof." Wolfe, on October 25th, notified his client of the receipt of this communication from Weller.

On October 31, 1919, Wolfe verbally informed the president and secretary of the plaintiff company that Weller had conveyed to him (Wolfe) information that the building could not be purchased for less than $415,000, with a cash deposit of $25,000, and that Weller had offered to return the $10,000 check, which he represented had not then been cashed. Thereupon plaintiff drew its check, dated November 1, 1919, payable to Weller as agent, in the sum of $15,000, and delivered the same to Wolfe, who in turn made delivery to Weller, taking from Weller a receipt, dated November 1, 1919, "the same being written at the bottom of the previous receipt for said $10,000, thus making the total cash deposit of $25,000, in accordance with the demand of the defendant Weller as communicated to plaintiff by Wolfe." Thereupon a written agreement of even date for the purchase of the building was entered into between plaintiff and Weller, as agent of the owner, the price being fixed at $415,000, with $25,000 cash deposit, the assumption of the trust for $225,000, the execution of a second trust in the sum of $43,000 for the benefit of the United States Mortgage & Trust Company, and the payment of the further cash sum of $122,000. At the end of this agreement, and immediately before Weller's signature, was the following:

"Approved by the agent of the owner of the above-described property under authority to him by said owner. Of the purchase price of $415,000, the sum of $405,000 shall apply on account of purchase price and $10,000 on account of fee charge."

The Columbia Title Insurance Company and the Real Estate Title Insurance Company have joint offices and are jointly interested in the business of examining, searching, and certifying titles to real estate, and in making settlements in the matter of real estate purchases. These companies represented the plaintiff in this transaction, and, when the president and secretary of the plaintiff, on December 6, 1919, were about to call at the office of these companies to effect a settlement on their agreement to purchase the Jenifer Building, they stopped at Mr. Wolfe's office at his suggestion, and there met Mr. Weller, who, in the presence of plaintiff's officers, asked Wolfe whether they "had seen the new agreement of sale of the Jenifer Building, and then Wolfe produced from his desk three copies of a new agreement, and showed it to

the president and secretary; that being the first time that plaintiff or any of its officials had seen on heard, directly or indirectly, of the same." This so-called new agreement reduced the sum to be paid in excess of the cash deposit to $380,000, instead of $390,000, but in other respects it was the same. Weller insisted that, although the total price named in this new agreement was $405,000; "the plaintiff, in making settlement at the Title Insurance Companies' offices, would be required to make settlement on the basis of the purchase price of $415,000. to be paid by plaintiff; that, in view of the exigencies of the situation then presented to it, the fact that plaintiff's necessities in carrying on its business required it to be located in the building, and the fact that plaintiff, in reliance on the signed agreement of November 1, 1919, had made all arrangements to complete the purchase of the building, and particularly in view of the fact that the defendant Weller absolutely refused to go ahead and complete settlement of the sale to plaintiff by delivering the deed conveying the Jenifer Building to plaintiff, unless the new agreement was executed by plaintiff to take the place of the then existing agreement, and in view of this refusal of the defendant Weller, plaintiff was confronted with the necessity of yielding to said duress and compulsion of the defendant Weller, or enter upon litigation to compel the conveyance of the building to it in accordance with the existing agreement, with the record title to the building not being in it during the litigation, but in the defendants United States Mortgage & Trust Company, * * * plaintiff, under said exigencies and duress and compulsion practiced on it by the defendant Weller, signed the new agreement." Thereupon plaintiff, having fulfilled the conditions of the agreement, received a deed dated November 29, 1919, executed by the mortgage and trust company, and conveying the premises to plaintiff in fee simple.

Subsequent to this settlement—and, in the absence of a more specific statement, and because of the inherent probabilities, we must assume it was very soon thereafter—plaintiff discovered that Weller, notwithstanding his statement to the contrary, had cashed the check for $10,000. It may be noted here that this check was not certified.

Plaintiff says it did not discover, until the month of May, 1920, "that the defendant Weller was charging, or purporting to charge, plaintiff with a fee of $10,000, or with any fee or charge of commission whatsoever in the matter"; that it discovered (but when it is not stated) the circumstances surrounding the transfer to Miss Erickson, namely, that the transfer to her "was merely to hide the name and identity of the real person or persons in interest"; and, finally, that "owing to the means employed by the defendants Weller, Erickson, United States Mortgage & Trust Company, and others as hereinbefore set forth, * * * the plaintiff was, under the duress and compulsion practiced upon it, induced to pay more for the Jenifer Building than the real person or persons in interest, or real owner or owners of the building, would have been willing to accept on a sale thereof to plaintiff, and has been damaged accordingly; that plaintiff, in addition, has been damaged to the extent of the $10,000 of its money paid over by the defendants the Title Insurance Companies to the defendant Weller in

the settlement of the purchase as hereinbefore set forth; and that plaintiff, by reason of the means and duress and compulsion practiced upon it as hereinbefore set forth, was induced and compelled to pay more for the purchase of the Jenifer Building than the building was at said time, and is now, actually worth."

The prayers of the bill are: First, for the discovery of the identity of the real owner; second, an accounting by Weller of the cash received by him from the Title Companies; third, that the United States Mortgage & Trust Company and the Union Exchange National Bank, both foreign corporations, be restrained from disposing of the notes for the $43,000; fourth, for a personal decree against Weller, and any other defendant or defendants, in such sum or sums as the court may find plaintiff to be entitled; and, fifth, for general relief.

[1] Plaintiff corporation presumably is composed of business men. It affirmatively appears that Julius I. Peyser, Esq., was its secretary and attorney throughout this transaction, and that Mr. Wolfe, another attorney, also represented plaintiff. We therefore are not dealing with a case involving parties unfamiliar with business affairs or likely to be easily imposed upon. In such circumstances, courts ought to look with disfavor upon any undue delay in seeking equitable relief. Here plaintiff received its deed to this property early in December of 1919. Notwithstanding the averment in the bill, to the effect that its officers did not discover until May of 1920 that they actually had paid Weller a fee of $10,000, the conclusion is irresistible that at the time the transaction was completed they must have known, not only that fact, but ever other material circumstance upon which they rely. Attached to the first agreement of November 1, 1919, was this provision:

"Of the purchase price of $415,000, the sum of $405,000 shall apply on account of purchase price and $10,000 on account of fee charge."

It would be a tax upon our credulity to ask us to assume that Mr. Peyser and Mr. Wolfe, who represented the plaintiff, and who were in touch with Mr. Weller, did not fully understand the exact meaning of this plain provision. It meant, and could have meant, only one thing, namely, that the purchaser was to pay the agent a fee of $10,000. While it is customary for the owner to pay such a fee, it is not at all unusual for an express agreement to the contrary to be made. The agreement of even date, which superseded this agreement, did not differ from it in effect, for under the second agreement plaintiff was to pay $405,000 for the property and pay Weller a fee of $10,000. For aught that appears, the second agreement may have been drawn by Mr. Wolfe, who produced it. At all events, it presumably was signed under the advice of plaintiff's two attorneys. The first agreement was enforceable, and plaintiff was put to an election whether to sign the second agreement or stand on the first. There is no question as to Weller's authority to represent the legal owner, the United States Mortgage & Trust Company, whose deed plaintiff finally accepted; and that Miss Erickson was an employee of Mr. Weller, and without financial resources sufficient to enable her to purchase this property, must have become known to plaintiff's officers immediately. Moreover, the owner had a right to place the record title in Miss Erickson, and thus

make her a conduit of title. This alone, therefore, was not a suspicious circumstance. We already have intimated that the fact that Mr. Weller cashed the check for $10,000 must have been discovered very soon thereafter. The check not having been certified, it was not strange that he should have cashed it, and thus made the deposit a reality. Immediately upon ascertaining that the owner would not accept $410,000 (which we must assume included his fee), Mr. Weller offered to return the deposit. This was a strict compliance with the language employed in his receipt, for he there said: "The sum of $10,000 to be returned to R. Harris & Co." if the contract was not approved.

[2] Plaintiff further says that it has been unable to discover the real owner, and alleges that it has been compelled to pay more for the property than the real owner "would have been willing to accept on a sale thereof to plaintiff." For aught that appears, plaintiff had as much information on this point when it received the deed as now. We have, then, a case where a corporation, composed of business men and represented by able counsel, deliberately accepted a deed to a piece of property, and thus ostensibly closed the transaction. Notwithstanding that, in a transaction of this magnitude, delay would be almost certain to prejudice the rights of the former owner, plaintiff waited almost one year before bringing suit, and even then asked, not for a rescission, but, in substance, for a reduction in price. We are of the view that, in the circumstances, even had plaintiff sought rescission, the delay would have been too great. McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. 29, 35 L. Ed. 804; Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419.

[3] While the decree might be affirmed, therefore, on the ground of undue delay in seeking redress, we prefer to discuss the merits to some extent. In the first place, the contention that the expectancy of a renewal or extension of plaintiff's lease was a valuable property right, as between plaintiff and the owner, cannot be sustained, since the rights of the parties to a lease are controlled by its terms and the statute. Morse v. Brainerd, 42 App. D. C., 448. Indeed, any other rule would tend to perpetuities. The case of Davis v. Gray, 16 Wall. 203, 227, 228, 21 L. Ed. 447, is relied upon by plaintiff, but that case involved the question of equitable relief against forfeiture of a land grant by the state of Texas to a railroad company upon the fulfillment of certain conditions precedent. The Civil War having caused delay in the fulfillment of those conditions, the court relieved against forfeiture of the grant by allowing additional time for the fulfillment of the conditions. The court incidentally referred to the good will of a lease, which the landlord was in the habit of renewing, as property subject to protection in equity, and cited Phyfe v. Wardell & Woolley, 5 Paige (N. Y.) 268, 28 Am. Dec. 430, wherein the Chancellor said:

"Although, as between landlord and tenant, the complainant had no legal or equitable right to a renewal, as it depended upon the mere volition of his landlord, yet, in regard to third persons, he had an interest which a court of equity recognizes as a valuable and vendible interest."

It was further pointed out that a renewal of a lease by a tenant in possession is considered in equity as a mere continuance of the original

lease. In that case the complainant, as the lessee of premises, part of which he had let to a subtenant, contracted with the defendants to sell his interest in the premises to them, for the purpose of enabling them to obtain a renewal without prejudice to the rights of the subtenant. In consequence of the agreement the defendants obtained a new lease in their own names, and then proceeded to evict the subtenant, whereupon the complainant was compelled to make good his loss. It was held that the complainant was entitled to a decree for specific performance of the agreement with the defendants, and to be indemnified against the claim of the subtenant. It is apparent, therefore, that the case involved third parties, as did Jones v. Slauson et al. (C. C.) 33 Fed. 632, cited by plaintiff.

[4] The conclusion that, had the real owner of the building come forward, a better trade might have been effected than was secured through his agent, furnishes no basis for equitable relief. As we have seen, the deed was delivered early in December of 1919, all the material facts were of record, and certainly all were attempted to be set forth in the bill filed in November of 1920, yet the real owner has not complained, and hence must be assumed to be without cause for complaint. The owner had an absolute right to be represented by an agent and to remain as an undisclosed principal. Huffman v. Long, 40 Minn. 473, 42 N. W. 355; Moorehead v. Gilmore, 77 Pa. 118, 18 Am. Rep. 435. It is not averred that he had fixed a price for the property and that the agent exacted a higher price and fraudulently retained the difference, as in Hokanson v. Oatman, 165 Mich. 512, 131 N. W. 111, 35 L. R. A. (N. S.) 423, and other cases cited by plaintiff.

[5] The most the agent has done in this case has been to secure the highest possible price for the property of his principal, and to exact from the purchaser, presumably by direction of his principal, his broker's commission. It will be observed that $10,000 is approximately 2½ per cent. of the purchase price of $405,000, and is not an unreasonable fee. Certainly the agent was entitled to do what his principal could have done, namely, obtain the highest price the purchaser could be induced to pay, and such is the law. McLennan v. Exchange Co., 170 Mo. App. 389, 156 S. W. 730; Ripy v. Cronan, 131 Ky. 631, 639, 640, 115 S. W. 791, 21 L. R. A. (N. S.) 305. In the case last cited the court, after directing attention to the fact that no obligation to buy rested upon the purchaser, said:

"If the law were as contended for by appellant, then every vendee of property could escape the obligation of his contract, just so he afterwards established the fact that at the time of the sale the vendor or the agent representing him was willing to take less than he represented that he would take for the property disposed of. This would impose no duty on the purchaser. The validity of his purchase would depend, not upon what he was willing to pay, but upon the price at which the property might be purchased."

[6] While it is alleged that the price paid for the property was excessive, the facts disclosed by the record tend to the contrary. Although it was sold by Miss Davis for $300,000, plaintiff's lease on the ground floor and basement had a substantial term to run, and that this lease seriously affected the value of the property is apparent from the

averment that plaintiff was tentatively offered $100,000 by the purchaser to cancel it. As the good faith of this offer is not impugned, we must assume that the new owner was willing to expend a total of $400,-000 to get what plaintiff received for $415,000—that is, immediate possession of the entire property—and plaintiff admits the property possessed peculiar value to it.

[7] Reduced to its last analysis, the plaintiff was confronted with the necessity of making an election between buying this property or removing its business to another location. With knowledge of every material circumstance, it deliberately chose the former course, and must abide the consequences. We are clearly of the view that there is no ground for the rescission of this contract, much less for the particular relief prayed, for it is the rule that a contract of sale cannot be avoided in part only, although, whenever the point at which fraud begins clearly appears, there may be such a division. Veazie v. Williams, 8 How. 134, 12 L. Ed. 1018.

The facts alleged in plaintiff's bill impose no equitable or legal liability upon the defendants, or any of them; so that it would be futile to direct a transfer of the case to the law side of the court, and we therefore affirm the decree, with costs.

Affirmed.