## FLANNERY et al. v. FLANNERY BOLT CO.
### No. 6946.

Circuit Court of Appeals, Third Circuit.
Aug. 11, 1939.

Rehearing Denied Jan. 5, 1940.

W. Denning Stewart, William J. Kenney, and Stewart & Lewis, all of Pittsburgh, Pa., for appellants.

Roy G. Bostwick, John E. Laughlin, Jr., William H. Parmelee, Thorp, Bostwick, Reed & Armstrong, and Stebbins, Blenko & Parmelee, all of Pittsburgh, Pa., for appellee.

Before BIGGS, CLARK, and BIDDLE, Circuit Judges.

BIDDLE, Circuit Judge.

This suit grows out of a prior proceeding in which the complainant, Flannery Bolt Company, obtained a decree in the District Court for the Western District of Pennsylvania directing J. Rogers Flannery, the defendant, a former president and director of the complainant, to pay it the sum of $1,111,805.16, found by the court to have been misappropriated. 16 F.Supp. 803. On appeal this court affirmed the decree, with certain modifications. 3 Cir., 86 F.2d 43. In the present suit, which is ancillary to and in aid of the former proceeding, the complainant seeks to recover from Flannery and the other defendants certain patents, applications for patents and inventions which the complainant claims equitably belong to it, since they are the proceeds of funds misappropriated by Flannery.

Flannery owned all of the stock of Flannery Bolt Co., incorporated in 1921. In 1926 the complainant was organized under the same name and acquired all the assets of the 1921 corporation. Both corporations have been engaged in the business of manufacturing and marketing locomotive staybolts and accessories, including an apparatus for testing the condition of staybolts. Among the assets acquired was a claim for refund of corporate income taxes which was paid in 1933 in the amount of $170,460.07. Flannery caused the check to be cashed and $170,000 of the proceeds to be invested in United States Treasury bonds, and turned over to his brother-in-law, Paul J. Friday, an attorney who had represented the complainant. The lower court found in the former suit—and this court sustained the finding—that the refund constituted an asset to which the 1926 corporation was entitled under the assignment, and that Flannery had misappropriated the $170,000 and must account for it.

Under Flannery's directions, $50,000 of these bonds were given to him for alleged "services" in obtaining the refund, and he turned them over to his wife without consideration; $41,000 went for "expenses" claimed by Flannery to have been incurred by him, with which we are not here concerned; and the remaining $79,000 found their way to American Stentex Corporation and Pittsburgh Dry Stencil Company, both defendants below and appellants here. The complainant contended that these securities were used to develop and perfect the patents and inventions sought to be recovered by the bill of complaint. The lower court found that the complainant was in equity entitled to the stock of American Stentex Corporation and of Pittsburgh Dry Stencil Company, and to the patents and inventions, and ordered them transferred to complainant.

Flannery had resigned as president and director of the Flannery Bolt Company (1926) on June 28, 1933, two days before cashing the refund check. On August 7,

1933, he caused to be incorporated, through Friday, American Stentex Corporation, one of the defendants. Flannery was its president and dominated it. Before he resigned from the complainant corporation Flannery obtained from one Fuller a license agreement to manufacture stencils, under Fuller's patent, after he had them tested by an employee of complainant corporation, an inventor called Grover R. Greenslade. Flannery's son, J. Rogers Flannery, Jr., who was then 21 years old, paid $15,000 for the agreement, which his father caused to be taken in his name, and assigned it to Stentex in return for all its common stock, 3,000 shares. He returned 250 shares to Stentex, which, together with 500 shares of its preferred stock were issued by Stentex to the 1921 Flannery Bolt Corporation, which then turned over to Stentex $50,000 of the treasury bonds.

Greenslade had had a long experience with the complainant and its predecessor in inventing and perfecting locomotive staybolts and staybolt testing devices. On September 14, 1933, at the request of Flannery, Sr., he entered the employment of Stentex, and there worked under Flannery's direction. The first bill of complaint was filed on November 2, 1933. In January, 1934, Flannery caused the organization of Pittsburgh Dry Stencil Company, one of the defendants. The directors and officers of Stentex were Flannery, his wife and his son until June 1934. They were also directors and officers of the Stencil Company.

For a few months Greenslade worked on stencils, but soon, under Flannery's orders, began to experiment with testing devices. The expense of the experiments was at first charged to Flannery, although later, at his direction, the entries were changed, and the expenses charged to his son. In June, 1934, Greenslade was transferred from Stentex to Stencil, and the experimental expense account was assumed by Stencil. Greenslade continued his experimental work, particularly on an electro magnetic tester, on which a number of patent applications were filed and assigned by him to the Stencil Company. The "electel device", one of the two primary inventions sought here to be recovered, was originated and first reduced to practice by Greenslade about the time he was transferred from one corporation to the other. On June 15, 1935, four days after the District Court had handed down its opinion in favor of the complainant, he was giv-en space by Flannery, Sr., in the Flannery building where he continued his experimental work. On July 12, 1935, he entered Mrs. Flannery's employment, and she thereafter paid his salary as well as the expenditures for equipment.

It is not disputed that Greenslade worked for the two defendant companies, and for the Flanneries, during this period, and he disclaimed any personal interest in the patents and inventions. The court below found that these patents and inventions, and the other assets of these companies, were paid for by funds diverted by Flannery from the complainant, and decreed that they should be restored to it. The evidence amply sustains the finding.

It is argued that the proceeds of the bonds cannot be traced into American Stentex Corporation since $15,000, paid for the Fuller Agreement, was contributed by Flannery, Jr., an "innocent" owner. But Flannery, Jr., was but a straw man for his father, and there is evidence to show that this money came from the proceeds of the treasury bonds.

Similarly the res, the converted treasury bonds, are traced into stock of the Pittsburgh Dry Stencil Company. The company's control ledger shows receipt of $21,000 in cash from sales of its stock to the 1921 Flannery Bolt Corporation; and, with the exception of $3,211.83 realized from the sale of stencils, the balance of the total funds received by the Stencil Company during the period involved came from the sale of 1,200 shares of Reynolds Spring Company stock, which it had also received in payment of stock from the 1921 corporation. The latter had acquired the Reynolds stock from Flannery in exchange for $8,000 of the treasury bonds. The Stencil Company sold the Reynolds stock at a profit of $10,570.63.

■ Appellants urge that these inventions are in part the property of Mrs. Flannery, and that her rights should not be disregarded. Mrs. Flannery loaned $2,-000 or $3,000 to the Stencil Company while Greenslade was with it; she paid his salary after he left the Company. But there is evidence that these advances came from the proceeds of the sale of the treasury bonds, and the learned trial judge so found. The patents were developed from resources improperly taken from the complainant; and Mrs. Flannery, who was a link in the machinery for diverting them, cannot object to their return on the ground that

comparatively small sums of her own were intermingled. Vorlander v. Keyes, 8 Cir., 1 F.2d 67.

The res therefore is traced from the original bonds into the patents and inventions which their proceeds were used to create and improve. Flannery took the bonds as a trustee ex maleficio for the 1926 corporation. The patents and inventions are still subject to that trust. "It is an undoubted principle * * * that as between a cestui que trust and trustee and all parties claiming under the trustee, otherwise than by purchase for valuable consideration without notice, all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruits of such property, whether it is in its original or its altered state, continues to be subject to or affected by the trust."[1]

In Erie County v. Lamberton, 297 Pa. 406, 414, 147 A. 86, 88, the court sustained a decree striking off satisfaction of a mortgage which had been satisfied with trust funds improperly mingled with other funds. "Being a trust fund for the benefit of plaintiffs, it can be followed in equity so long as identification is possible * * *." In Lansdowne Bank & Trust Co.'s Case, 323 Pa. 380, 388, 186 A. 120, 124, the court said: "No mere change of form can divert the funds of the trust so long as they can be traced and thus identified." To the same effect see United States v. Dunn, 268 U.S. 121, 45 S.Ct. 451, 69 L.Ed. 876, where converted rights in oil property were traced into the stock of a corporation; Republic Supply Co. v. Richfield Oil Co., 9 Cir., 79 F.2d 375, 377, where the res was traced into stock in trade, equipment, and real estate; and Elmer Co. v. Kemp, 9 Cir., 67 F.2d 948. In the Republic Supply Co. case the court said [79 F.2d 377]: "It is established beyond debate that no change of form can divest a trust fund of its trust character, and that the cestui may follow and reclaim his funds so long as he is able to trace and identify them, not as his original dollars or necessarily as any dollars, but through and into any form into which his dollars may have been converted."

Appellants argue that the trust funds— the bonds—have not been specifically traced into the patents, but merely shown to have been mingled with general corporate assets, and cannot, under the cases, be identified and recovered. But all of the assets of both these corporations, and their stock, were but the fruit of the proceeds of the trust funds. They belong to the complainant corporation. There are not intervening rights of any bona fide purchaser.

In Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752, the court treated as a trustee ex maleficio of patent rights, one who had stolen the idea of an invention and patented it.

Other contentions of appellants may be briefly disposed of. The complainant on December 14, 1937, executed a general release to Mrs. Flannery. This, appellants say, was the release of one joint tort feasor, and accordingly released the others. But this misapprehends the nature of complainant's rights. It is not bringing a suit for damages but claiming property which in equity belongs to it. This suit is in the nature of a reclamation proceeding. In re Erie Trust Co., No. 1, 326 Pa. 198, 191 A. 613. The release does not divest complainant of its property. Veazie v. Williams, 8 How. 134, 49 U.S. 134, 12 L. Ed. 1018.

Appellants assert that the original decree of 1935 vested the res in Flannery. But the Pennsylvania doctrine that a judgment in trover for conversion passes title to the res has never been applied to proceedings in equity to trace the proceeds of the res. It is confined to cases of trover. Brennan v. Huber, 112 Pa.Super. 299, 171 A. 122.

At the trial Friday was asked by complainant's counsel to identify a copy of his income tax return, which at first he was unable to do, but later, recalled by appellants, identified. Complainant did not mark this paper as one of its exhibits, or introduce it as part of its case. It does not appear from the record how it was procured. Appellants claim it was used improperly contrary to the Act of Congress;[2] and that the complainant therefore comes

---

[1] Pennell v. Deffell, 4 DeGex, M. & G. 372, 388 (1854).

[2] The Act of February 26, 1926, § 1115, as amended by the Act of June 6, 1932, § 55, 26 U.S.C. § 55(g), 26 U.S. C.A. § 55(g), provides: "* * * it shall be unlawful for any person to print or publish in any manner whatever not provided by law any income return, or any part thereof or source of income, profits, losses, or expenditures appearing in any income return."

into equity with unclean hands and should not be entitled to recover. But it cannot be assumed that the copy of the income tax was improperly obtained, In re Epstein, 6 Cir., 4 F.2d 529; it was never offered in evidence and did not relate directly to the transactions involved, Knights of the Ku Klux Klan v. Strayer, 3 Cir., 34 F.2d 432; or go to the cause of action, Chute v. Wisconsin Chemical Co., C.C., 185 F. 115, 118.

The decree of the court below is affirmed.