# FLANNERY BOLT CO. v. FLANNERY.
### No. 2856.

District Court, W. D. Pennsylvania.
June 11, 1935.

Thorp, Bostwick, Reed & Armstrong, of Pittsburgh, Pa., for plaintiff.

Watson & Freeman, of Pittsburgh, Pa., for defendant.

SCHOONMAKER, District Judge.

This is an action in equity wherein the plaintiff corporation is seeking to recover an accounting from defendant, former president and director of the plaintiff corporation, of certain corporate funds and property alleged to have been misappropriated by the defendant and converted to his own personal use; and, in addition, an assignment by the defendant to the plaintiff corporation of certain inventions developed by the defendant during his incumbency as president of the plaintiff corporation.

The case was heard on bill, answer, and proofs.

We have made and file herewith our findings of fact and conclusions of law showing that the plaintiff corporation is entitled to the relief prayed for in the bill of complaint.

Briefly summarized, the record shows that the defendant, from the date of the organization of the plaintiff corporation in 1926, to the latter part of June, 1933, was its president and director, and during that period owned a greater portion of its common stock and controlled and dominated a majority of the board of directors. Previous to the formation of the plaintiff corporation, the defendant was the president and director of a Delaware corporation formed in 1921 under the name of Flannery Bolt Company, in which he owned and controlled all of the capital stock. The board of directors of that company consisted of himself; his wife, Adelaide F. Flannery, his brother, James J. Flannery; and Franklin H. Allison, an employee of the defendant in that corporation and other companies in which he was interested.

From 1921 to 1926, the defendant was the sole shareholder of the Flannery Bolt Company (1921 corporation), managed it and controlled it as though it were his own personal property, as in fact it was. In the year 1926, the defendant made an arrangement with the American Locomotive Company to join him in the business which the 1921 corporation had been conducting in the manufacture and sale of flexible stay bolts for boilers, with the understanding that the American Locomotive Company was contributing to the enterprise $1,500,-000 in cash. This was accomplished by organizing a new Delaware corporation by the name of Flannery Bolt Company, the

plaintiff corporation in this case, with 25,000 shares of common stock of no par value, and 15,000 shares of preferred stock of the par value of $100 per share; the American Locomotive Company subscribing and paying for this 15,000 shares of preferred stock, $1,500,000. The plaintiff corporation then bought all of the property and assets of the Flannery Bolt Company (1921 corporation), paying $1,500,400 in cash, and 25,000 shares of its non-par value common stock. This common stock of the plaintiff corporation then was allotted, 2,500 shares to the American Locomotive Company, and 22,500 shares to the defendant in this case. This preferred stock had the privilege under the by-laws of electing, and did elect, one director for the plaintiff corporation. Later, in February, 1927, an additional class of preferred stock was authorized for the plaintiff corporation, known as class B preferred stock, of which 5,000 shares were sold for cash to the amount of $500,000. This class B preferred stock had the right to elect one director for the plaintiff corporation. The defendant, by reason of his ownership of 22,500 shares of the 25,000 shares of common stock, controlled the election of the balance of the directors of the plaintiff corporation, and elected to those positions, himself; his wife, Adelaide F. Flannery; his brother, James J. Flannery, Jr.; and his employee, Franklin H. Allison, who was also an employee of the defendant in numerous other Flannery enterprises. Through this directorate, the defendant dominated and controlled all the actions of the plaintiff corporation; in fact, he operated the plaintiff corporation, handled its funds and property as his own, drew large sums of money for his own personal use beyond his regular salary allowance, and acted, with reference to salaries and moneys of the plaintiff corporation, as though the entire corporation was his personal property; and this, though others had trusted to the enterprise, $2,000,000.

We regard the conduct of the defendant as improper in violating the trust imposed upon him as president and director of the plaintiff corporation. The fiduciary character of the relationship of the defendant as president and director of the plaintiff corporation is so well established in law as hardly to need the citation of any authority. We content ourselves with a statement of the rule laid down in Thompson, Corporations, vol. 2, § 1321, as follows: "The peculiar trust relation held by a director does not admit of his creating any relation between himself and the trust property which will make his interest antagonistic to that of his beneficiary. The relation of a director to his corporation is fiduciary, and the law forbids him from making a contract in which his private interest may conflict with the interest of the corporation. The directors in all such cases occupy a position of trust and act in a fiduciary capacity. In all the contracts they make they represent the stockholders and not themselves; and in all their official actions they are to consider, not their private interests, but that of the stockholders, whose property they manage and control. This rule is so strict and so rigidly enforced that the law will not permit these officials to subject themselves to any temptations to serve their own interest in preference to the interest of the stockholders."

Now, as we judge the matters complained of, in the light of this rule, there can be no question that the plaintiff corporation is entitled to the relief prayed for; and we take up, and consider these matters, one by one.

In the first instance, there is the sum of $137,400 representing moneys of the plaintiff corporation, which the defendant misappropriated in the form of personal withdrawals to himself through cheques of the corporation signed by himself as president, and Allison as treasurer, drawn for his own personal affairs. There is no evidence in the case that any corporate purpose was served by these withdrawals. The only justification which the defendant offers as to these items is that they were personal advances and loans to himself. Certainly the president of a corporation cannot lawfully draw corporate funds for his own personal use. It does not appear from the evidence that any other directors or parties in interest were consulted by the defendant or acted in the matter of these loans and advances. So it is clearly a case of the drawing of corporate funds for his own personal use. This transaction we regard as unlawful, per se, because the defendant participated in these transactions, both on the side of the corporation as well as for himself. A cheque for these amounts, countersigned by the treasurer, can give no validity to these transactions, for it is clearly held that a court of equity will always look through any device which corporate directors may

use to conceal their own personal interests in dealing with corporate property. Wardell v. Union Pac. Railroad Company, 103 U.S. 651, 26 L.Ed. 509. In fact, in regard to these withdrawals, there is no pretense of any corporate action; nor any authority for these withdrawals can be found or any minutes, either of the directors or of the stockholders of the plaintiff corporation. Witness Truschel, bookkeeper of the plaintiff corporation, testified that he prepared these cheques largely at the behest of the defendant, who, in several instances, informed Truschel that he was withdrawing the money as an advance of salary; and yet, when at the end of the month, the defendant collected his salary in full, the bookkeeper had no alternative than to alter the record and show that these amounts were loans or advances to the defendant. Witness Roney, the individual bookkeeper of the defendant, testified that he used these moneys so advanced to pay defendant's personal obligations and expenditures indiscriminately without regard to the source of the funds. In addition to all that, the witness Truschel testified that the defendant directed Truschel to conceal his withdrawals from the directors and stockholders. In the balance sheet of the plaintiff corporation, these withdrawals were concealed under accounts receivable, and in the treasurer's reports of receipts and disbursements, they appeared under some deceptive heading, or "raw materials."

■ The next item of complaint has to do with $69,400 covering corporate cheques made by the defendant as president of the plaintiff corporation and countersigned by Allison as treasurer, payable to the order of Flannery Manufacturing Company, a corporation owned and controlled exclusively by the defendant. There is no dispute over the fact that these cheques were issued, and it does not appear that any corporate purpose was served by these payments. The supporting memorandum for each voucher contains the statement: "Advance (F. M. Co.)." The defendant's explanation of these withdrawals is not satisfactory, and in our opinion does not justify the expenditure. His explanation and defense for these and other withdrawals is that he spent these moneys for the benefit of the plaintiff. He declares that among other amounts he spent the sum of $77,558.71 for operating and other expenses of the Flannery Manufacturing Company for the making of certain experimental investigations for the plaintiff corporation.

However, we are not satisfied that this is the true explanation. At any rate, no authority for these withdrawals appears either in the minutes of the board of directors or the stockholders. In making these advances, the defendant certainly acted in his own behalf and not in behalf of the plaintiff corporation of which he was president and director. As a trustee and fiduciary of the plaintiff corporation, he cannot lawfully stand on both sides of this transaction.

■ The next item complained of deals with $34,244.76, representing funds of the plaintiff corporation received and converted by the defendant in connection with the sale and exchange of securities belonging to the plaintiff corporation. In dealing with securities belonging to the plaintiff corporation, the defendant did not deal in the name of the corporation. His dealings were in the brokerage account in his own name at a Pittsburgh broker's. There may be a question whether there is any legal justification for the defendant's dealing in securities for the plaintiff corporation at all, but be that as it may, even if he did deal without proper corporate authority, he is chargeable with any profits that arose from any of these transactions. As to this item of $34,244.76, the fact of the earning of this item of profits seems to be conceded by the defendant's answer, and is further confirmed by Defendant's Exhibits A, B, C, and D, except the item of $7,254.45 arising out of the purchase of Kelsey-Hays Wheel Corporation common stock. The evidence shows that on October 27, 1928, the plaintiff corporation paid the defendant $22,000 in cash, together with $35,000 face amount of Rio Grande De Dul bonds, which he then pledged with the Oakland Savings & Trust Company. The sums of $32,000 and $22,000 thus obtained were used by defendant to purchase, in his personal brokerage account, one thousand shares of Kelsey-Hays Wheel Corporation common stock. This stock was purchased October 16, 1928, by defendant for $50,000, and the difference between the purchase price and the amount received by defendant as aforesaid retained by him. The defendant never actually delivered this stock to the plaintiff corporation. Subsequently the pledged Rio Grande bonds, upon which defendant borrowed $32,000, were sold for the sum of $35,754.45, thus leaving a profit of $3754.45, which the defendant appropriated to his own use, leaving

the amount that the plaintiff corporation is entitled to under this transaction, $7254.45.

We now come to the sum of $4,125 representing dividends and distributions on securities belonging to the plaintiff, which were held by the defendant in his own account, and on which he received dividends and distributions which he treated as his own. There is no explanation by the defendant for such course of conduct; he is clearly accountable for this item.

The next claim arises out of the item of $36,775 representing the cost of 1,000 shares of Great Northern Ore certificates, the property of the plaintiff corporation, which were sold by the defendant without authority and without any accounting of the proceeds to the plaintiff corporation. The defendant does not deny that the certificates were the property of the plaintiff corporation, and that they were sold by the defendant, but at a loss. In our view of this transaction, the dealing was not authorized, and the defendant is chargeable with the total amount of corporate funds that went into this transaction.

The next item represents the sum of $36,066.15, being the amounts drawn by the defendant in bonuses in excess of amounts authorized by resolution of the board of directors. From the organization of the corporation, the president's salary was fixed at $2,000 per month and commissions of one-third of a cent for each and every part of a Rigid and Flexible Bolt Assemblage sold and shipped by the Flannery Bolt Company, excepting gaskets and porous plugs for which the commission was to be one-sixth of a cent. From time to time thereafter the salary of the defendant was increased; but nothing further was said about commissions. At a meeting of the directors held February 26, 1929, a resolution was passed stating: "A bonus was declared in favor of the president, of 50% of his total salary for the year 1928." Similar bonuses were declared for the years 1929 and 1930. In computing the amount to be paid him on these bonuses, the defendant included not only his salary, but also 50 per cent. additional on all commissions, which were clearly not within the terms of the resolution authorizing the payment of bonuses. These bonus resolutions, of course, must be construed strictly against the defendant because of his participation in their passage, and because they inured to his personal benefit to the detri-

ment of the stockholders. It is perfectly plain, under the resolution, that the bonus payment must be confined to the fixed salary amounts, and does not attach to the commissions.

The next item of complaint goes to the salary item of $65,790 paid to the defendant's wife, Adelaide F. Flannery, out of corporate funds, at the rate of $12,000 per year from November, 1926, to May 30, 1932. In the first instance, the by-laws of the plaintiff corporation provided that the salaries of all officers of this corporation shall be fixed by the board of directors. The directors of the corporation never authorized payment of any salary to any officer other than the defendant. The right to pay Adelaide F. Flannery must rest upon the by-laws and minutes of the corporation; and if no authority for the payment of salary is shown, the defendant is clearly chargeable, because he signed the cheques on which these moneys were drawn from the treasury. Although Allison, the treasurer, countersigned the cheques, his testimony intimates that the defendant was in complete charge of all the transactions of the plaintiff and completely controlled and dominated Allison on the countersignature of cheques, Allison testifying that the only authority he wanted for the countersignature of the cheques was the signature of the president to the cheque itself. In connection with this salary item, it is of interest to note the witness Roney testified that the defendant Flannery told him he had arranged the salary for his wife for the express purpose of meeting premiums on his life insurance. In addition to that, there was no evidence that Adelaide Flannery performed any systematic regular service to the corporation. True, she occasionally visited the offices. She sometimes signed cheques in the absence of the defendant, assisted in the purchase of Christmas presents which were distributed to several trade customers. But on the basis of merit, that certainly did not justify the payment of salary. True, Mrs. Flannery attended directors' meetings, but for that attendance she received a compensation at the rate of $20 a meeting, as authorized by the directors. As to her relationship with the business of this corporation, the testimony of Roney and Truschel threw considerable light upon the subject when they said that after Mrs. Flannery had made inquiries as to the state of the plaintiff corporation's business and financ-

es, they were specially instructed by Mr. Flannery to give her no information whatever.

We now come to the next item involved in this suit, the refund of federal income taxes which were collected by the 1921 corporation and the proceeds thereof received by the defendant. When the plaintiff corporation was formed, it acquired all the property and assets of the 1921 corporation; and in connection with that purchase, a bill of sale was executed by the 1921 corporation to the plaintiff corporation, which conveys "all personal property and assets of every kind and description now owned by said Flannery Bolt Company, a Delaware corporation organized in 1921, or in and to which it has any right, title or interest." There is no question in our minds that this includes plainly refund of taxes. There is no ambiguity in this language, and there is nothing in the bill of sale by which it could be interpreted to limit the generality of the language above quoted. The defendant sought to set up an understanding between himself and Fitzpatrick, president of the American Locomotive Company, prior to the sale, in which it was agreed that the tax refund would be excluded from the property sold to the 1926 corporation, and also sought to show that McCormack, a director of the plaintiff corporation, confirmed the understanding that the tax refunds were to remain the property of the 1921 corporation. We do not think this testimony was admissible, and could not, and did not in any way limit the generality of the words of conveyance. We cannot see how the understanding of Fitzpatrick or McCormack in any way would be interpretive of the particular language of this conveyance. Even if we admit that such was the understanding of Fitzpatrick, it was not carried forward into the agreement, either for the formation of the company or into the subsequent bill of sale. The agreement of September 30, 1926 (Exhibit 2 attached to amendment to answer), sets forth the agreement which led to the formation of the plaintiff corporation. This agreement contains this clause: "Flannery will cause the new company to acquire from the Bolt Company, and the Bolt Company agrees to sell, convey, assign, transfer and dispose of to the new company all of its property, assets, rights, claims and privileges as an entirety." There can be no question that these tax refunds belonged to the plaintiff corporation; and it is evident that the defendant himself had that idea, too, because of the fact that in securing the last large payment of tax refund, precaution was taken not to deposit the cheque in the Pittsburgh banks, but to open account in Washington for the collection of the government cheque and the purchase there of Liberty Bonds, which, with the exception of a sufficient number thereof necessary to pay the expenses involved in the collection of this refund, were sent to Pittsburgh and delivered to the defendant in this case.

The next item of accountability is based upon an indebtedness aggregating $284,430.30 which the defendant owed to the 1921 corporation. This was carried on the balance sheet of the 1921 corporation under the heading of "Bills Receivable"; and Flannery, in the agreement for the formation of a new corporation (Exhibit 2 attached to the answer) agrees as follows: "Flannery agrees that at the time of such conveyance the assets and liabilities of the Bolt Company shall be identical with those shown by the Bolt Company's balance sheet of June 1, 1926, of which a copy has been delivered to the Locomotive Company." In the items that make up the bills receivable in this balance sheet, there is one in the amount of $182,501.30, representing the withdrawals of money taken by the defendant out of assets of the 1921 corporation; and there is an item in the sum of $101,625 representing an obligation of the defendant to the 1921 corporation and charged to his own individual account. There is no doubt that the defendant was fully aware, before the formation of the 1926 corporation, and at the time of the preparation of the balance sheet of June 1, 1926, showing this accounts receivable item, that these items were carried in that account, because he talked with his bookkeeper, Truschel, about it, and discussed with Collins, when Collins prepared the balance sheet, the methods of carrying the defendant's obligations. The accounts receivable of the 1921 corporation conveyed by the bill of sale to the plaintiff corporation as of November 1, 1926, contained these two accounts owing by the defendant.

To show that the defendant did not wish his associates in the plaintiff corporation to know that the accounts receivable included these items, when the monthly balance sheet (Plaintiff's Exhibit 16a) was prepared, it showed accounts receivable in the sum of $601,909.30. The defendant regarded the amount so large as to arouse suspicion, and thereupon directed the sup-

pression of that balance sheet and the preparation of a new one which would segregate the Funk Air Spring Company item of $101,625 into a new account and would be declared to be the Funk Air Spring Company refund. This word "refund" apparently must have been added to the account for the purpose of conveying the impression that the amount shown was an amount owing from the Funk Air Spring Company. The defendant takes the position that this item of $101,625 arose out of a patent infringement suit, and that when the 1921 corporation issued bonds aggregating over $750,000, the underwriters of the bonds insisted that the defendant enter into an agreement to protect the company from liability because of claims in this patent suit which was settled by the payment of $101,625 out of the funds of the 1921 corporation, this amount being thereupon charged to himself individually on the books of that company, in accordance with his agreement of indemnity. He argues that when the bonds of the 1921 corporation were paid off out of the purchase price received from the plaintiff corporation, his obligation to pay this account was at an end. We cannot so hold. These two items were carried into the balance sheet of the 1921 corporation, and we think the defendant is now estopped from denying that this $101,625 is his own personal obligation. On the whole matter, there can be no escape from the conclusion that the defendant was accountable to the plaintiff for this $284,430.30, with interest thereon from November 1, 1926, because it is defendant's obligation to the 1921 corporation purchased by the plaintiff and fraudulently represented by him as trade accounts receivable, certain in character and in amount.

The defendant sought to set up certain offsets against the moneys advanced to him by contending that the same were expended for the benefit of the plaintiff corporation and were acquiesced in by its board of directors. The first item is an offset of $52,000, being par value of bonds of the Detachable Bit Corporation of North America, transferred by defendant to plaintiff corporation and credited to defendant on plaintiff's books. We find that this claim of credit is obviously an error. The testimony was that the plaintiff received and paid for $142,000 face amount of these bonds. $50,000 face amount of bonds was turned in to plaintiff for $50,000 in cash; the remaining $92,000 face

amount of bonds being exchanged in a transaction involving stock of the Keystone Stores Corporation and for stock of the Vanadium · Metals Corporation. But this whole transaction was merely a technical transaction, the bookkeeper, Truschel, having testified that the defendant told Truschel to enter this credit, although no transfer of stock was ever made to the plaintiff. This Detachable Bit transaction resolved itself into this situation. The defendant took down $50,000 worth of bonds of the Detachable Bit Corporation, and the plaintiff paid $50,000 for the same. The defendant then took down $92,000 additional face amount of these bonds and exchanged them to the plaintiff corporation for worthless stock which the defendant had heretofore conveyed to the plaintiff corporation for value. There was a manufacturing contract between the Bit Corporation and the defendant individually, the defendant then causing plaintiff corporation to manufacture these bits of different sizes for defendant at a price of 16 cents and 20 cents respectively. But, in the meantime, the defendant had inserted himself between the plaintiff and the Detachable Bit Corporation, and arranged to receive from the latter a commission of not less than 4 cents on each bit, being one-fourth or one-fifth, depending upon size, of the amounts which were supposed to be received by the plaintiff for manufacturing the bits. We cannot see anything in this transaction that was for the benefit of the plaintiff corporation. The bits in question manufactured by the plaintiff corporation at the behest of the defendant were billed to the Flannery Manufacturing Company for the manufacturing price; and if there was any profit on the contract, it was not received by the plaintiff corporation. The Flannery Manufacturing Company, according to the books of the plaintiff corporation, still owes for the manufacturing of these bits. Then, the credit for $77,558.71 for money alleged to have been expended in behalf of the plaintiff corporation by the Flannery Manufacturing Company, is in the same category, there being no evidence of benefit to the plaintiff corporation from this transaction.

We now come to the patent situation. As to the invention known as "double flexible bolt," there is no question that this bolt was developed during the incumbency of the defendant as president of this corporation; but as Flannery admitted on the witness stand, these inventions belong to

the plaintiff corporation; and he expressed his willingness to execute the application and assign it to the plaintiff corporation, provided a proper description of the invention were included. The application and specifications prepared by Parmelee, the patent attorney, we are of the opinion correctly described this invention and should be executed by the defendant.

As to the Shure Tell Tale Bolt, our .conclusion is that the contention of the defendant that this device was developed by Friday, his brother-in-law, is not a correct statement of the transaction. It does not appear that Friday's connection with the bolt business is such that it is at all likely that he could have conceived this idea; and our finding is that the Shure Tell Tale Bolt was developed at the plaintiff corporation's plant by the defendant Flannery, and the Patent Committee of the plaintiff corporation, and that so far as that particular invention is concerned, the plaintiff corporation is entitled to the shop rights in it.