## FLANNERY BOLT CO. v. GREENSLADE et al.

### No. 3193.

District Court, W. D. Pennsylvania.
June 3, 1938.

R. G. Bostwick and Jno. E. Laughlin, Jr., of Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., for plaintiff.

W. D. Stewart, of Stewart & Lewis, all of Pittsburgh, Pa., for defendants.

SCHOONMAKER, District Judge.

This is an action in equity, by which the plaintiff, a corporation, is seeking to

recover from defendants certain patents, applications, and inventions which the plaintiff contends are in equity the property of the plaintiff-corporation. The case was heard on bill, answer, and proofs. We have filed herewith our findings of fact and conclusions of law indicating that the plaintiff is entitled to the relief prayed for. A brief résumé of the facts in the case may be stated as follows:

The plaintiff is a Delaware corporation organized in November, 1926, to succeed to the business and assets of another Delaware corporation of the same name, which had been organized in 1921, and is referred to as the 1921-Corporation to distinguish it from the plaintiff in this case. The defendant, J. Rogers Flannery, had been the sole stockholder of the 1921-Corporation as well as its president and a director. His wife, Adelaide Friday Flannery, and one Franklin H. Allison, were also officers and directors of the 1921-Corporation, Mrs. Flannery being its vice-president and Allison, its secretary and treasurer. When the plaintiff was organized, it acquired all the business, properties and assets of the 1921-Corporation, including its name, paying therefor $1,500,400 in cash, and twenty-five thousand shares of its common stock. The plaintiff, on its organization, had five directors, four of them being the defendant, J. Rogers Flannery; his brother, James J. Flannery, Jr.; his wife, Adelaide Friday Flannery; and Franklin H. Allison. J. Rogers Flannery then became the president of the plaintiff-corporation while his wife became the vice-president, and Allison, its secretary and treasurer.

The plaintiff, from that time until the present, like its predecessor, the 1921-Corporation, has been engaged in the business of manufacturing and marketing locomotive staybolts and accessories, including a standard apparatus for testing the condition of staybolts. One of its most important products is a flexible staybolt which is designed to hold in place the boiler-sheets of steam locomotives. These staybolts require a periodic examination to determine their condition, and several devices have been suggested from time to time for the purpose of testing them. The test now used is the so-called hydrostatic test, which has been made standard by the Bureau of Locomotive Inspection. The staybolts which have been manufactured by the plaintiff and its predecessor have a so-called "telltale hole" running through the length of the bolt. To supplement this test, the plaintiff has provided a so-called electric tester, which comprises a long slender probe with a handle, in which is built a suitable indicating device. The probe is inserted in the tell-tale hole of a stay-bolt being tested, and when it reaches the end of the hole, an electrical circuit is completed, as is indicated by a flashing light or meter on the handle of the tester. Both the plaintiff and its predecessor have from time to time experimented with other devices for ascertaining the condition of its staybolt, and for the purpose of that experimentation, employed as a physicist to make experiments, the defendant in this case, Grover R. Greenslade.

From the time of the organization of the plaintiff-corporation until June, 1932, J. Rogers Flannery, Adelaide Friday Flannery, Franklin H. Allison, and James J. Flannery, Jr., composed a majority of the board of directors of the plaintiff, and conducted its affairs. J. Rogers Flannery controlled a majority of the stock from the standpoint of voting power. In June, 1932, Adelaide Friday Flannery and James J. Flannery, Jr., resigned their offices with the plaintiff-corporation, which was followed in August of that year by the resignation of Allison. The defendant, J. Rogers Flannery, continued as president and director until June 28, 1933, when he resigned.

In November, 1933, the plaintiff brought an action in equity in this court at No. 2856 against the defendant, J. Rogers Flannery, to recover various sums of money which he had misappropriated and converted during his term of office. That case was tried and a decree was entered in this court, Flannery Bolt Co. v. Flannery, 16 F. Supp. 803, directing the defendant, J. Rogers Flannery, to account to the plaintiff for a sum in excess of one million dollars; but up to the present time the plaintiff has been unable to obtain an accounting for more than $4500.11. The purpose of the present action is to trace certain tax-refund moneys belonging to the plaintiff, which the defendant, J. Rogers Flannery, misappropriated into certain patents and inventions which were developed by the use of moneys thus misappropriated. These tax-refund claims grew out of certain claims made by the 1921-Corporation for the refund of certain taxes paid by it, which became the property of the plaintiff by virtue of its acquiring all the assets of the 1921-Corporation. The

largest refund in amount was $170,460.07, which the defendant, J. Rogers Flannery, collected through the 1921-Corporation under circumstances which this court held in the case of the plaintiff against J. Rogers Flannery at No. 2856 Equity established that said tax-refund was the property of the plaintiff, and that such refund had been misappropriated by the defendant, J. Rogers Flannery to his own use. The net proceeds of this fund, after allowing the expenses of collecting, was $158,115.06. That refund the defendant, J. Rogers Flannery, collected through the medium of the 1921-Corporation, and immediately converted into United States Treasury bonds. In the early part of 1933, J. Rogers Flannery became aware the refund would be paid, and had the directors of the 1921-Corporation authorize Allison to receive it, sending Allison to Washington, D. C., on the night of June 28, 1933 (the day Flannery resigned as president and director of the plaintiff-corporation), to receive the tax-refund in person. The refund-cheque was cashed on June 30, 1933, by the Liberty National Bank in Washington; and Allison at once purchased $170,000 face amount of United States Treasury bonds, due 1951–1955, in negotiable form and payable to bearer. These Treasury notes were received in Pittsburgh by mail on July 7, 1933; and the directors of the 1921-Corporation then met and authorized Allison to turn the bonds over to Paul J. Friday, an attorney who had represented the plaintiff-corporation, and who is Mrs. Flannery's brother. Friday received these Treasury notes on July 7, 1933, and lodged them in his individual safety-deposit box. These Treasury-notes were from time to time taken out of Friday's safety-deposit box and cashed under the direction of J. Rogers Flannery. Among the dispositions of this money, $50,000 was paid to the defendant, American Stentex Corporation for the consideration of the issuance of five hundred shares of its preferred stock, and two hundred and fifty shares of its common stock to the 1921-Corporation; $8000 thereof was used to purchase from J. Rogers Flannery twelve hundred shares of Reynolds Spring Company, which was delivered to the 1921-Corporation, and by it ultimately turned over to the defendant, Pittsburgh Dry Stencil Company, for stock of the latter company. In addition, $21,000 proceeds of said refund were turned over to the defendant, Pittsburgh Dry Stencil Company, as consideration (with the twelve hundred shares of Reynolds Spring stock) for one hundred shares of the preferred stock, and two hundred shares of its common stock; and $50,000 thereof was turned over to J. Rogers Flannery as alleged compensation for his services. This $50,000 was handed by J. Rogers Flannery to his wife, Adelaide Friday Flannery.

The two defendant-corporations, American Stentex Corporation and the Pittsburgh Dry Stencil Company, were organized by the defendant, J. Rogers Flannery; and he controlled their operation. The American Stentex Corporation was organized in July, 1933, apparently through the efforts of J. Rogers Flannery, Jr., who really took part in the organization of this corporation as a representative of his father through money furnished largely out of the proceeds of the tax-refund. This situation is equally true of the Pittsburgh Dry Stencil Company, which was financed from money received from the proceeds of the tax-refund. Through the medium of these two defendant-corporations, Flannery senior hired the defendant Greenslade to continue his work of experimenting with staybolts. Greenslade entered the employ, first, of the American Stentex Corporation, and began to experiment with staybolts, concentrating his attention on the principle of the electro magnetic tester. After the Pittsburgh Dry Stencil Company was organized in January, 1934, Greenslade went to work for that company and continued his experiments on staybolt testers. He worked on two types of testers, one known as the electro magnetic tester, and the other known as the electel device. After Greenslade had been working for a time on the electel device, he was moved from the plant of the Pittsburgh Dry Stencil Company to the Flannery Building in Pittsburgh, where his services were paid for by Adelaide Friday Flannery, the wife of J. Rogers Flannery. It is perfectly clear to us that the funds she used for that purpose were out of the $50,000 proceeds of refund-tax money that came to her from her husband, J. Rogers Flannery. Proof was offered at the trial that J. Rogers Flannery, Jr., paid certain moneys to the Pittsburgh Dry Stencil Company and the American Stentex Company; and we were not satisfied that he used his own money for that purpose, but were of the opinion that he used moneys that came to him through his father out of these tax-refunds.

We find from the evidence as to the electel device that it was originated by the defendant, Greenslade, while he was working for the Pittsburgh Dry Stencil Company; that his work was being financed out of funds belonging to the plaintiff; and that from the period from June, 1935, to November, 1935, the expenses for developing it were paid by Mrs. Flannery out of proceeds of the tax-refund money belonging to the plaintiff.

On these facts we are clearly of the opinion that the plaintiff is entitled to the assignments of the inventions in the electro magnetic tester and the electel tester by reason of the facts that funds misappropriated by the defendant, J. Rogers Flannery, were used by the defendants knowing all the circumstances of developing said inventions.

The principle that a defrauded party may follow funds into the proceeds and profits thereof is a well-established principle of law. We do not need to enlarge upon that, merely referring to our discussion of that phase of the case in our opinion filed herein on February 2, 1937, on the defendants' motion to dismiss the bill of complaint.

Even if it be true that J. Rogers Flannery, Jr., and Adelaide Friday Flannery may have made contributions toward the expenses of developing these two devices that will not estop the plaintiff from recovering the devices and inventions, for certainly both Flannery, Jr., and his mother had full knowledge of all the circumstances of the case, and cannot be innocent investors in these inventions.

The defendants have urged that the plaintiff, by securing a decree against J. Rogers Flannery in the suit pending at No. 2856, have elected to pursue J. Rogers Flannery and secure a general judgment against him, which may be enforced only by the ordinary processes of execution. We think there is no such election in this case, because the decree of the court merely directs the defendant, J. Rogers Flannery, to account for the money received; and this present suit is an action in aid of a prior suit and is ancillary to the prior proceedings. See Ferguson v. Omaha & S. W. R. Co., 8 Cir., 227 F. 513; Brun v. Mann, 8 Cir., 151 F. 145, 12 L.R.A.,N.S., 154; Hume v. City of New York, 2 Cir., 255 F. 488; Loy v. Alston, 8 Cir., 172 F. 90; Lang v. Choctaw, Oklahoma & Gulf R. Co., 8 Cir., 160 F. 355; Hobbs Mfg. Co. v. Gooding et al., 1 Cir., 176 F. 259.

In the present case, we do not see really how the plaintiff could be charged with any duty to make any elections of its course of proceeding, for the reason that it was not until the facts were developed in the instant suit that the plaintiff knew what disposition had been made of its tax-refund moneys which the defendant, J. Rogers Flannery, had collected. Surely, to constitute a binding election, the party must, at the time the election is alleged to have been made, have knowledge of all the facts; and it ought not to be barred merely because he proceeded at that time against J. Rogers Flannery.

[6] The rule correctly to be applied is that the plaintiff may have, of course, not more than one satisfaction; but the general rule in cases of trust is that when the trust-property has been misappropriated or misapplied by investing it in an unauthorized manner, the beneficiary may pursue and recover the trust-property so far as it can be traced, unless the purchaser or holder of it has obtained a good title against the beneficiary. Sweet v. Bank & Trust Co., 69 Kan. 641, 77 P. 538; Fowler v. Bowery Savings Bank, 113 N.Y. 450, 21 N.E. 172, 4 L.R.A. 145, 10 Am.St. Rep. 479; Newhouse v. First National Bank, D.C., 13 F.2d 887, affirmed 7 Cir., 17 F.2d 228.

The defendants further contend that the plaintiff is barred from any relief in this case, for the reason it has executed a release which releases the defendant, Adelaide Friday Flannery, from any claim against her personally in the instant suit. This release provides that it was "not to be construed as releasing any right which the foregoing Flannery Bolt Company may claim by, through or under the aforesaid Adelaide Friday Flannery, in the equity suit now pending in the United States District Court for the Western District of Pennsylvania at No. 3193 In Equity." If the plaintiff in this case were suing for damages against joint tort-feasors, this release would be effective to bar its recovery. We cannot see that it has any application to the issues in the present suit, where the plaintiff is seeking to recover certain inventions, the record title to which rests in the Pittsburgh Dry Stencil Company, as the assignee from Greenslade, so far as concerns the patent and application of the magnetic tester, and in J. Rogers Flannery,

so far as concerns the so-called electel device.

The plaintiff's tax-refund money which J. Rogers Flannery misappropriated went through many hands. If the plaintiff can trace defendants' funds into the inventions and patents which it is seeking to recover in the instant case, it certainly would now, in equity, be entitled to relief by requiring the assignment to the plaintiff from the present holder of these inventions and patents. We do not see here a case of joint liability at law by the defendants. Their accountability to the plaintiff rests upon different grounds. J. Rogers Flannery made the first misappropriation by securing the payment of tax-refund money, so he could convert it into Government Treasury notes, then placed it in the hands of his brother-in-law in Pittsburgh, had it taken out from time to time at his direction, and put into corporate agencies under his control, and persons under his control. Therefore, the accountability as to the several defendants rests upon different grounds, J. Rogers Flannery resting upon his acting in misappropriation, and the others as the agencies through which that misappropriation was made, and which are separately accountable for their own part in carrying out the misappropriation.

The release of Mrs. Flannery is not like the release of a joint trespasser or a joint contractor. In equity, we are of the opinion that it is specifically limited to Mrs. Flannery alone. Veazie v. Williams, 49 U.S. 134, 156, 8 How. 134, 12 L.Ed. 1018. We regard this case as conclusive on that point. The release of Mrs. Flannery does not satisfy and extinguish the cause of action, for she played only one part, and received only a portion of the originally misappropriated funds.

The defendants in this case raise another objection to the maintenance of this suit. They suggest that the plaintiff is barred from obtaining any relief in the instant case, because of its failure to observe the well-established legal maxim that he who comes into a court of equity, must come with clean hands. The facts on which defendants base this contention are these. During the trial, when Paul Friday, a witness called by the defendants, was on the witness-stand and was being examined by plaintiff's counsel, there was shown by that counsel to the witness a paper, and the witness was asked if it was a photostatic copy of his Federal inome-tax re-

turn for the year 1933. The witness refused to identify the paper as such. The witness was then asked if he would furnish the plaintiff with an office-copy of his return, and he said he would look to see if he had such a copy. Some days later he was again called to the witness-stand by the plaintiff and asked if he had produced a copy, and he replied "no." The witness was then again shown by plaintiff's counsel the document in question, and was asked if it was a photostatic copy of his Federal income-tax return; he declined to identify it as his income-tax return. Later on in the trial, Friday, the witness, was again called to the witness-stand, this time as witness for the defendants; and then testified that the document shown to him by the plaintiff's counsel was a photostatic copy of his income-tax return for the year 1933.

We believe these facts would not bar the plaintiff from having relief in the instant case. As we understand the law, the doctrine of clean hands is available only when the plaintiff has been guilty of unconscionable or unlawful conduct in respect of the transaction which is before the court. Many authorities sustain this view. See Cunningham v. Pettigrew, 8 Cir., 169 F. 335; Shaver v. Heller & Merz Co., 8 Cir., 108 F. 821, 65 L.R.A. 878; Knights of the Ku Klux Klann v. Strayer, 3 Cir., 34 F.2d 432; Chute v. Wisconsin Chemical Co., C.C., 185 F. 115.

In the instant case, the witness Friday is not a party to this litigation. If there was any misconduct on the part of counsel of the plaintiff in having in his possession a copy of Friday's income-tax return for the year 1933, that is not a matter which affects the merits of this litigation in any way. The transaction did not occur until the instant case was on trial, and had, and could have no effect upon the cause of action in which the plaintiff was suing. The income-tax return was not offered in evidence in this case. The plaintiff called Friday as a witness, and of course he would be bound by his answers. There is no reason at all for barring this action on account of an occurrence with reference to the examination of the witness Friday as to the alleged copy of his income-tax return for the year 1933.

On the whole case, therefore, we conclude that the plaintiff was entitled to have assigned to it the inventions, patents, and applications involved.